Petition of UNITED STATES.

Petition of ISBRANDTSEN CO., Inc.

THE EDMUND FANNING.

United States District Court,
S. D. New York.
May 19, 1952.

See also, D.C., 89 F.Supp. 282.

Lord, Day & Lord, New York City, for petitioner, Isbrandtsen Co., Inc., Thomas F.

Daly, Henry C. Blackiston, Jr., New York City, of counsel.

Myles J. Lane, U. S. Atty., New York City, for claimant, United States, Edward L. Smith, Erwin Rossuck and Ruth Kearney, New York City, of counsel.

RYAN, District Judge.

This is a limitation proceeding by Isbrandtsen Company, Inc., seeking exoneration from or limitation of liability as chartered owner of S.S. Edmund Fanning with respect to claims arising out of fire and explosion occasioning the total loss of the vessel and her cargo in Genoa on March 13, 1947.

On September 4, 1947, Isbrandtsen Company, Inc. filed a petition in this Court for exoneration under the Fire Statute, 46 U.S.C.A. § 182 from any loss, damage or injury in any way arising out of or in consequence of the fire and explosion on board the Fanning, or, if it was to be adjudged liable, then that its liability be limited to the value of its interest, if any, in the Fanning after the fire.

The United States of America filed claim for the loss of ten locomotives and tenders, which were loaded on board the Fanning in Bremen, Germany, by the United States Army for shipment to Korea. All other claims filed on behalf of cargo interest and others have been settled and withdrawn or were dismissed at the conclusion of the trial.

The issues raised by the answer of the Government came on for trial on December 4, 13, 14, 17 and 18, 1951. I make the following

Findings of Fact.

Isbrandtsen Company, Inc. is a corporation organized and existing under the laws of the State of New York with its principal place of business at 26 Broadway, County, City and State of New York.

Isbrandtsen was the bareboat charterer of the S.S. Edmund Fanning, which was owned by the United States of America. Isbrandtsen, at all times hereinafter mentioned, manned, victualed, supplied, operated and controlled the Fanning and was her owner, *pro hac vice* and within the meaning of Section 4286 of the Revised Statutes of the United States, 46 U.S.C.A. § 186.

The Fanning was a steel vessel of the type commonly known as a Liberty ship, 422 feet in length, 57 feet in breadth, 35 feet in depth, 10,572 tons deadweight, 7,176 tons gross and 4,380 net tons burthen. She was engaged in the transportation by sea for hire of general cargo. She had three holds forward and two aft.

In December, 1946 Isbrandtsen decided to engage in freight service from Continental European ports via Suez to the Far East. The Fanning was assigned to that service and when it met disaster was on the first voyage of the service.

The Fanning, laden with a cargo of coal, departed from Philadelphia, December 23, 1946 for La Pallice, a port in northern France, where all the cargo was discharged and the voyage ended. The Fanning's next voyage, which ended in the disaster at Genoa, Italy, on March 13, 1947, included calls at ports in Western Europe and the Mediterranean. The following are her arrival and departure dates on that voyage:

| Port | Arrival | Departure |
|------|---------|-----------|
| Bremen | January 19, 1947 | February 6, 1947 |
| Rotterdam | February 8, 1947 | February 13, 1947 |
| Antwerp | February 14, 1947 | February 22, 1947 |
| LeHavre--Rouen | February 24, 1947 | February 25, 1947 |
| Bordeaux | February 28, 1947 | March 1, 1947 |
| Barcelona | March 8, 1947 | March 9, 1947 |
| Genoa | March 10, 1947 | ........ |

The Fanning was scheduled to call at other ports in the Mediterranean en route on her voyage to the Far East via the Suez Canal.

On December 27, 1946, Isbrandtsen by its Vice President Matthew S. Crinkley, entered into a contract by telephone with the United States of America, acting by Colonel Thomas S. Lowry, Chief of the Ocean Traffic Bureau of the Office of the Chief of Transportation, United States Army, to transport as common carrier, 10 locomotives and tenders from Bremen to Pusan for $10,000 per unit of locomotive and tender; the Army to load and unload, and the carriage to be performed pursuant to the terms and conditions of a Government form of bill of lading. This contract of carriage was confirmed by an exchange of letters and the subsequent issuance of a Government form bill of lading.

After leaving La Pallice, the Fanning proceeded to Bremen. Under way the cargo holds were cleaned, preparatory to receiving other cargo. The Fanning arrived in Bremen January 19, 1947.

At Bremen, the Fanning began to take on cargo for her voyage to the Far East. Only the cargo stowed in No. 2 hold is of importance in this proceeding for it is undisputed that it was in No. 2 hold that the fire of March 13, 1947 broke out. United States Army stevedores loaded and stowed the ten locomotives and tenders, stowing 6 locomotives and 2 tenders in No. 2 lower hold on rail and timber beds secured by wire lashings, clips and turnbuckles. Four locomotives were stowed abreast fore and aft, to the aft of No. 2 lower hold; two tenders were stowed amidships, to the fore of No. 2 lower hold, and two locomotives were stowed one each to the wings of the tenders. The locomotives loaded on the Fanning were the property of the United States of America and were being sent by the United States Army in Germany to units of the Army stationed in Korea. The shipment was from parts of Germany occupied by the United States and was destined for parts of Korea occupied by the United Nations. The locomotives were "heavy lifts" each 85 tons dead weight and the tenders were 25 tons each.

No 2 lower hold was approximately 80 ft., 10 inches long, 54 ft. wide, 25 ft. deep and had a bale capacity of 92,008 cu. ft. The locomotives and tenders measured 31,698 cu. ft. and occupied slightly more than one third of the bale capacity of the hold, although it was the largest hold of the vessel.

At Rotterdam, the next port of call, additional cargo was taken aboard. In No. 2 hold were placed 225 bags of activated carbon, stowed between the tenders.

At Antwerp, on February 15, the Fanning started to load chemicals, along with considerable other cargo. There, 1,950 casks of chlorate of potash were stowed in broken stowage around, between and over the locomotives. At least 33 cases weighing 6 tons of sodium peroxide were stowed inside the tenders at the bottom of No. 2 lower hold. Separate partitions were then built around the locomotives, tenders and this cargo, and flooring laid over them (as shown in Claimant's Exhibit—5C). It is important to note, too, that it was reported to Isbrandtsen that "about 12 tons of dunnage wood was shipped on board the S/S Edmund Fanning at Antwerp" and "that a large amount of this wood was used to make platforms between the locomotives and tenders" (Ex. 14-J-L55). The wooden platforms and partitions erected to make compartments in No. 2 hold were no small operation. The chlorate of potash was stowed on February 15, 17, 18 and 19; the sodium peroxide on February 15.

There was also loaded in No. 2 hold at Antwerp at least 94½ tons and 75 bags of 100 lbs. each of sodium nitrate. (Ex. 28, 14-J-L34).

The chlorate of potash is described in the bills of lading as contained in "barrels" and "kegs". It is fair to assume that they were of wood, in the absence of proof to the contrary. They were marked for "Special Stowage".

The sodium nitrate is scheduled as being shipped in "wooden barrels" and "bags".

Then, while still at Antwerp, 132 large iron drums of sulphuric acid were lowered into and stowed in No. 2 lower hold. It is not disputed that these drums weighed

altogether 50 tons; they were overstowed and placed above the other chemicals.

Before the vessel reached Genoa, there had also been put into No. 2 hold, close to the sulphuric acid, 760 cases of wines and brandy, 4 cases of socks, 2½ tons of nitrate of soda in bags, 10 cases of rayon tissue; and above the rayon tissue were stowed 308 cases of brandy and 488 bundles of cotton tissue.

At Genoa, 1,400 rolls of iron wire, 820 small barrels of nails and 110 cases of hemp twine were stowed on top of the drums of sulphuric acid in No. 2 hold. This was the cargo in the hold when the fire was discovered.

Concerning the position of the stowage there was also offered, in addition to oral testimony, three cargo plans—Ex. 12A, 12B and Claimant's Ex. 5-C and 28 (the last two are photostats of the same original).

Ex. 12A and 12B were made up by the stevedores and checkers after the ship was loaded at Antwerp. The ship stopped at three other ports before arriving at Genoa. These plans were prepared to show the cargo in the holds when the ship left Antwerp. They did not represent the placement of the cargo or the position of the separate shipments with relation to each other. They were not intended to show where anything was stowed, or as was testified "what was stowed above what" (SM p. 364).

Claimant's Ex. 5-C was received in evidence, without objection, as part of the deposition of Robert Markley, who was third mate aboard the Fanning on her last voyage. He testified that he had made a cargo plan on orders from Captain Fitzgerald given to him in Antwerp to search out the cargo as best he could; that he had secured the information from which he made up the plan by going into the holds and also from Captain Praast's plan which he had in his room tacked at the bulkhead. He also gave evidence that Captain Fitzgerald saw the plan before the vessel left Antwerp, and that the Captain was preparing a plan of his own. Markley testified that after drawing up a cargo plan in Antwerp he tried to make notation of all additional cargo taken aboard at subsequent ports. However this cargo plan was lost at the time of the fire on the ship; Claimant's Exhibit 5-C was prepared by Markley with Captain Fitzgerald and the second mate in a hotel room in Genoa after the disaster. To assist in the drawing of the cargo plan Captain Fitzgerald wired to all the ports of call for manifests and from these as well as the recollections of those he gathered with him the cargo plan Claimant's Exhibit 28 was drawn. We find that it is a correct representation of the cargo stowed in No. 2 hold and the relative position of the cargo at the time of the disaster.

No witness has testified from actual and personal observation as to the origin of the fire in No. 2 hold. We have been informed that the hatch of No. 2 hold was closed and covered over with a tarpaulin when smoke was first observed coming from the ventilator leading to the hold; no one was below at the time. It is not claimed that any of the cargo stowed in the hold was subject to spontaneous combustion or required special care and stowage to provide ventilation. This is not a case where the fire and the resulting loss were the result of spontaneous combustion due to improper ventilation.

The Government contends that

"Sulphuric acid draining from a leaking or ruptured drum onto the potassium chlorate would cause intense fire and, if it leaked on the sodium peroxide, would cause explosion. Such explosion or fire would further derange the stow, increase the admixture of the chemicals and intensify the resultant fire and explosion. No other explanation for this disaster has or can be offered."

Isbrandtsen urges that the evidence does not lead irresistibly to the conclusion that the fire originated in the way advanced by the Government, and that the proof does not fairly or reasonably exclude any other explanation for it. Isbrandtsen suggests that it is reasonably probable that the fire and subsequent explosion occurred in the following manner rather than in the way contended by the Government; that

"One or more of the longshoremen were smoking in the lower No. 2 hold during the early morning of March 13, 1947; that a lighted cigarette or cigarettes or match or matches was or were discarded; that they came in contact with one or more of the bags containing the nitrate of soda or some other inflammable material in the vicinity thereof; that the fire smoldered on from that time until the hatch was opened by one of the longshoremen just previous to the outbreak of the fire; that the opening of the hatch created a strong circulation of air, which fanned the smoldering fire into flame, which grew in volume and spread to the bags of nitrate of soda—if the fire had not already started there; that after some minutes and when the fire had obviously gained great headway, water was forced into the upper part of the No. 2 lower hold through the ventilators which ended at the top of No. 2 lower hold and that the water came in contact with the nitrate of soda, which resulted in a small hydrogen explosion. Hence the rumbling; and then, as more hydrogen was released, the large explosion followed."

No suggestion has been made of sabotage, or any other cause; nor has any evidence been presented from which a finding might be made that the fire was due to any other than the two suggested causes. In any consideration, it is argued that the evidence here presented leaves the court in a position where it cannot decide how the fire was either caused or started. Cf. Hoskyn & Co., Inc., v. Silver Line Ltd., 2 Cir., 1944, 143 F.2d 462.

■ Since it is not in dispute that the ship and cargo of the Government were destroyed by fire, the burden is upon the Government to show by a fair preponderance of evidence that the fire which damaged the Government's locomotives and tenders was caused by Isbrandtsen's neglect.

Section 4282 of the United States Revised Statutes (46 U.S.C.A., § 182, the American Fire Statute, March 3, 1851), commonly known as the "Fire Statute" provides that:

"No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

■ To sustain its burden the Government must establish: (1) That the stowage of the cargo in No. 2 hold was negligent and improper; (2) That the improper stowage was occasioned by and was due to the neglect of Isbrandtsen; and (3) That the improper stowage was the neglect that caused the fire.

We first consider whether it was established that the stowage was negligent and improper.

■ It is a fact of common knowledge in the shipping industry that iron drums containing sulphuric acid are prone to rupture and that the acid eats into the metal of the drums causing leakage.

The regulations of the United States and of the United Kingdom put Isbrandtsen and those in charge of the navigation and operation of the Fanning on notice not only as to the dangerous nature of the cargo they took aboard but of the special care required in its handling to insure the safety of the ship.

The regulations of the United States Coast Guard, Title 46, Sec. 146.22-6 provide that chlorates, nitrates, or peroxides should not be stowed in the same compartment as acids or in proximity to readily combustible materials. Similar regulations pertaining to the carriage of like cargoes are in force in the United Kingdom (Sec. 7, order of May 22, 1945; Ex. 29). The British regulations list potassium chlorate (which is synonomous with chlorate of potash), sodium peroxide and sodium nitrate, as "strong supporters of combustion"; and all are required to be "stowed away from all combustion materials, strong acids and explosives * * *." (Ex. 29).

Actual knowledge of the danger inherent in these chemicals was possessed by Captain Praast, Isbrandtsen's representative and agent. He testified that it was not "proper to stow sulphuric acid in the same hold with chlorated potash"; that it was not the custom to do so at the port of Antwerp (SM p. 435). It also appears that such a cargo stowed in the same hold could not lawfully transit the Suez Canal. It appears to be generally recognized and was known to both Captain Fitzgerald and Praast that sulphuric acid is customarily carried on deck. When it is not placed on deck, it should be carried in "deep tanks and bottom stowage, essentially bottom stowage, poop decks and center castles" where it is not liable to come in contact with other cargo (SM 186). Captain Praast noted sulphuric acid on the cargo and because all his life he had been "very wary" of it, he thought it should be loaded on the deck (SM 343, 344). But the fact is it went into No. 2 hold over the chemicals.

Captain Praast was confronted with a difficult problem endeavoring to accommodate and take aboard the various cargoes which had been booked by Isbrandtsen to be discharged at many different ports on the way to the Far East. A reading of his reports to Isbrandtsen makes this quite plain. He found that after loading the locomotives and tenders at Bremen "three of the lower holds are practically spoiled" (these were No. 1, 2 and 4 holds); he had a coffee cargo in No. 3 lower hold to be discharged at Genoa (and apparently, also 596 tons of sugar (Claimants Ex. 5-C)); and he was reserving two bottom spaces for Naples-Shanghai cargo, which was necessary to bring the ship in trim. He was "worried that cargoes may be booked", and he was "trying to do the best" he could. The 400 tons of cargo on deck made it necessary to have bottom weight in the ship after the cargo for Djibouti was discharged. But he reported "all went well at Antwerp because we had the right cargo to load in between and on top" (Ex. 14-J-L55). It is true that the difficulty was met at Antwerp and solved by the stowage in No. 2 hold but

at great peril to the ship, leading to its ultimate loss.

The stowage of the sulphuric acid in No. 2 hold was improper; it was grossly negligent when over stowed above the other chemicals which had been placed in the hold.

We next consider whether this improper stowage was the neglect that caused the fire. There are only two plausible explanations for the fire; one, urged by the Government, that it was due to careless stowage and leakage of the sulphuric acid on the chemicals stowed below; and the other advanced by Isbrandtsen, that the fire was occasioned by the carelessness and through the hand of man. No one testified that he witnessed the acid leaking from any of the drums.

The burden is upon the Government to prove by a fair preponderance of evidence that the fire was caused by the leakage of sulphuric acid and to do so it must make this possibility significantly more probable, on the whole evidence, than the alternative possibility of causation put forward by Isbrandtsen, involving carelessness by the stevedores or others in smoking in the hold.

In weighing the evidence on this issue we must consider the everyday practices of those who are experienced in the handling of similar cargo. Expert testimony has been offered by the Government on this; we have had testimony from a cargo surveyor—John Herbert Davies; and from a chemist—William George McKenna. No experts in the field of cargo stowage or chemistry were called by Isbrandtsen.

We accept Davies' testimony that sulphuric acid in drums is more likely to leak than any other acid cargo in drums; that the corrosive quality of the acid eats away the metal in the drums; and that steel drums will not hold sulphuric acid, even when diluted 50% with distilled water, because of the corrosive action of the acid. We are informed by the evidence that the drums were of steel; there is no evidence that they were lined with glass or porcelain.

We have had McKenna's testimony as to the inherent nature and quality of the chemicals stowed in the hold. We accept his evidence.

The Fanning arrived in Genoa on March 10, 1947. It rained quite a bit the first day in the port, and no cargo was taken on. The cargo was worked the second and third days—March 11th and 12th. The fire broke out on the morning of the 13th. Captain Fitzgerald went down into the holds on March 12th to look at the stowage; he saw no evidence of smoke or fire and no sign of anything broken in the holds. The Captain left the vessel that evening at 10 p. m. and returned the following morning, March 13th, at 10 a. m. to find that "the ship had exploded in the No. 2 hatch and she was afire and burning all over." The Captain got off the vessel about 1 p. m. She was then towed over to a breakwater where she burned for two days.

First Mate Wilson lost his life in the disaster. The Second Mate Getek did not testify.

Markley, the Third Mate, at about 9 a. m. on March 13th was on the main deck of the port side aft house. A shore side watchman at the gangway told him there was a fire forward. He went out on the boat deck to the forward end of the bridge where he met the Second Mate. He saw smoke coming out of the port ventilator of the No. 2 hatch; it was yellowish gray, bluish, milky smoke coming out of the ventilator; it was "continual issuing" smoke, not billowing. As best as he remembered, the hatch cover on No. 2 hold was closed, with a tarpaulin over it, but not quite battened down; no smoke was coming out of the hatch. He went to arouse the passengers and while he was inside the passengers' quarters "she let loose" and No. 2 hatch blew up. He thought that the explosion occurred in No. 2 lower hold; "it was something down that made the whole ship vibrate." The fire hoses and the steam smothering system were turned on, and the hoses put into the port ventilator of No. 2 mast housing. The hatch covers were not removed for fear of ventilating the fire.

The fire started in No. 2 hold and spread throughout the ship. The wind was blowing from the bow back toward the rest of the ship. The "black and gray" smoke was then terrific but he didn't see any flames. He scrambled off the gangway; on it he met the Second Mate. They took shelter ashore.

The Fanning had as part of its equipment an audible and visible "Kidde" type instrument or device constructed to put the ship on notice of the presence of a fire or incease in the temperature of any of the cargo holds. It was part of a fire protection system with a row of lights connected to it, set up in the wheelhouse. It was designed so that a light would flash on and an alarm sound to indicate in what section of the vessel there was fire. The only difficulty was that the device was out of order and had not been working since the vessel had left New York. In any event, at the time the fire was discovered no one was on watch on the bridge or in the wheelhouse, and no alarm was given by the device.

It appears from the blueprint of the hull of the vessel (Cl. Ex. 13) that the two ventilators (one fore, the other aft) ended at the top of the No. 2 lower hold. They did not carry down into the bottom of that hold. There appear to be no outlets in the ventilator trunks below deck, save at their bases or ends. Smoke originating in the upper hold would not reach the ventilator until it had first penetrated into the lower hold. How long it would take to do so would depend on many variable factors.

In a deposition, Giorgio Romano testified that he had been employed as a watchman aboard the Fanning in Genoa; that he reported for duty at 8 p. m. on March 12, 1947 and was assigned to prevent pilferage in hold No. 2 and to stop any one from approaching the hold; that he remained at No. 2 hold until 4 a. m. on March 13, 1947; that he was with a seaman below in No. 2 hold and saw the first mate "who frequently inspected No. 2 hold with a flash light"; that the loading of No. 2 hold was finished at 3:30 a. m. on March 13, 1947; that at that time the

first mate made an inspection and he then observed that everything was in order; that he was the last to leave the hold and that at no time did he see any crew members, workers, stevedores or long-shoremen smoking in or around the No. 2 hold. He testified on cross-interroga-tories that he could not give the approxi-mate number of persons on board the Fanning on March 13, 1947 but that there were eight persons—that is six workers, one member of the crew and himself—in No. 2 hold while cargo was being loaded into that hold.

Also, in a deposition Olcese Enrico Santo testified that he was "deputy chief of the loading and unloading gang" work-ing the Fanning in Genoa; that the load-ing of cargo began at 8 p. m. on March 10, 1947; that he was not present when the hatch of No. 2 hold was opened; that rolls of iron wire, cases and small barrels of nails were loaded in No. 2 hold and were stowed on top of other cargo already loaded; that he observed during the load-ing only that some cases were open and had been pilfered; that after the loading and at about 9 a. m. on March 13, 1947 he leaned over the side of No. 2 hold to see if any slings had been left behind and looked down for about half a minute; that he was then accompanied by "Mr. Banchiero, chief of the gang and by Mario Covelli, the representative of Gastaldi"; that at the time he noticed nothing spe-cial about the cargo, since he was only looking for slings; that after this he went to the poop. He then testified:

"I was on the poop at No. 4 hatch. I heard the alarm and supposed there was a fire aboard. I saw smoke issu-ing from the ventilator at No. 2 hold. I called my workers working below in order that they might help the crew in fighting the fire. We left the ship and went ashore. I heard no explo-sion and saw no flames before going ashore. When ashore we watched the crew using the fire hose and I heard the whistle. Then one great explosion occurred. I do not remem-ber hearing others."

He observed none of the stevedores smok-ing in the No. 2 hold and does not know what caused the fire or the explosion.

When we examine the testimony of Robert Markley, the third mate on the Fanning, we find no proof of smoking aboard the Fanning at or near the time of the fire. When asked specifically whether he saw longshoremen smoking in the No. 2 hold in Genoa, he replied

"I would say they smoked in the holds. Stevedores will, if they can get away with it" (P. 47, Ex. 5B).

But a few questions before he was asked the question:

"Q. And you say you don't re-member now that there was any smok-ing in the No. 2 hold in Genoa?"

to which he replied

"A. Well, I don't—I honestly don't recall any specific man smoking, but I would not say that they didn't either, because those Italians tried to smoke whenever they could get away with it."

and, later at page 48, he testified

"Q. Did you personally see any of the stevedores smoking in the No. 2 hold while the cargo was laden in Genoa? A. Well, it's hard to say. I mean right today, I would have to answer you no, but I would have to say that I didn't."

It was part of his duties to look for and prohibit smoking in the holds.

Markley had been down in the No. 2 hold "perhaps the day before" the fire, "probably late afternoon." They were loading something between decks; prior to arrival in Genoa, the hold was pretty well filled and the wooden hatch covers were over the lower hold of No. 2, but not battened down.

Cecil Hanes, a seaman aboard the Fan-ning, testified he had stood cargo watch in Barcelona, the last port of call before Genoa; there was no smoking in the holds. At Genoa, he again stood cargo watch in No. 3 and 4 holds. He was in town on his way to the vessel on March 13th when the fire broke out. He went aboard at about 10 a. m.; the ship was then smoking

from stem to stern, and in flames amidships; the Captain ordered him ashore.

Francisco A. Jardine, also a seaman, testified to the practice of having watches standing in the hold to keep the men from smoking. On the morning of March 13th he was on the starboard side of the passageway near the mess room when he was told of a fire in No. 2 hold. He saw smoke come from the masthouse ventilator leading to No. 1 or No. 2 hold. He and other seamen were ordered to put the tarpaulins on No. 2 hatch and batten down; he was doing that when he heard a rumble, a "thunderous sound" down in No. 2 hold. They tried to get down to the masthouse; the smoke was thick; he secured gas masks but the smoke was too thick and too intense to get to the masthouse. Water was poured down the ventilator for about 15 or 20 minutes before the explosion occurred. A second explosion occurred and he left ship.

The evidence shows that throughout the entire voyage a careful fire watch was maintained, particularly while the ship was in ports loading cargo; that there is no evidence of a fire in No. 2 hold prior to docking in Genoa; that the hatch had been closed and when removed in Genoa there was no evidence of fire; that throughout the loading at Genoa a fire watch was maintained; and the proof is that there was no smoking during that time by the crew or stevedores in No. 2 hold; that when the hatch was replaced after the loading there was no fire in No. 2 hold and that the fire started in the hold after the covers were replaced and was due entirely to the qualities of the cargo stowed in No. 2 hold and the negligent stowage of the cargo in that hold.

Sulphuric acid corrodes metal; it is fair to infer that the acid stowed in No. 2 hold acted as is usual, and that it did corrode the drums in which it was contained and cause leakage. The cargo plan establishes that the drums were stowed in such a position that leakage from them would reach the location where the chlorate of potassium and the sodium peroxide were stowed. The testimony of McKenna was that the admixture of sulphuric acid and sodium peroxide would "decompose the peroxide extremely rapidly and set in motion free oxygen, and if there were organic matter around, or which was certainly mixed with the peroxide when the acid contacted, you would have an ignition. There would be a fire and it would burn with extreme rapidity. It would ignite without any other source of ignition" (SM p. 198). He also testified that "the contact of the sulphuric acid with potassium chlorate results in the formation of a gas which is evolved, called chlorine dioxide, which is an unstable gas, and * * * will explode spontaneously under certain rather definite conditions" (SM pp. 198, 199). He attributed the explosion first occurring in No. 2 hold to "the contact of the sulphuric acid and the potassium chlorate and the freeing of this chlorine dioxide gas", which would explode and cause a fire of anything combustible (SM p. 211); it was also his opinion that pouring a small amount of water on a large nitrate fire would result in a hydrogen explosion (SM p. 212).

█ It is not basing an inference on an inference to find that the fire started from a leak or rupture in the drums containing the sulphuric acid, flowing down onto the potassium chlorate and the sodium peroxide. The plaintiff has sustained its burden of proof by establishing by a fair preponderance of the evidence that the fire was due to the negligent overstowing of the acid above the other chemicals.

We now consider whether the fire was caused by the design or neglect of the petitioner so as to deprive it of exoneration from liability under the Fire Statute, 46 U.S.C.A. § 182.

In December 1946, Captain Praast was sent to Europe by Isbrandtsen as supervisor of the new Far Eastern service. In a letter from Matthew S. Crinkley, Isbrandtsen's Vice-President, to Vinke and Co., its agent in Rotterdam, dated December 11, 1946 (Ex. 14-J-L01), it was stated that Praast would be "helpful * * in getting the new service to the Far East via the Mediterranean off to a good start," and that "by having some thorough dis-

cussions with the Masters of these first sailings along with the other ship officers he (Praast) would be able to give them a great many pointers that will be of distinct benefit to them personally and in operating these ships for us. We believe he will be able to assist the Masters and Officers of these ships with advice as to crew matters, supplies, and particularly with all the problems that may be involved in the loading, discharge and stowage of cargo." Praast had also been instructed in detail concerning "the background of our operations as to competitive policies, the quotation of rates, the relations with our valued agents, our interest in new possibilities, our willingness to take reasonable risks when we believe the prospects justify, etc., etc." In view of this letter, we find it difficult to accept Isbrandtsen's contention that Praast was a "relatively unimportant employee" acting in a purely advisory capacity and with no authority whatsoever over the European agents or the masters and other officers of Isbrandtsen ships.

In December 1946, the new Far Eastern service was in the formative stages. Isbrandtsen felt the need of having a personal representative on hand in Europe to protect the Company's interests and to secure for its ships the most profitable cargo obtainable. There is abundant testimony as to the weight the agents attached to "suggestions" emanating from Captain Praast. Joannes Hellemans, the General Manager of Vinke & Co.'s Antwerp office, testified by deposition that Praast introduced himself as "marine superintendent of, or representative from Isbrandtsen" (Ex. 10-C). Praast submitted no identification papers but Hellemans had previously heard through either Dens Ocean Co., Isbrandtsen's general agent in Antwerp, or Vinke & Co.'s Rotterdam office that Praast "acted for Isbrandtsen or was their representative." This witness further testified that Praast's activities consisted, in part, of "the supervising of the loading and the stowage, in consultation with the Captain and/or the First Mate." Marcellus Hoffbauer, chief tally-clerk for Lambert Gielen whose stevedoring company handled the loading of the Fanning at Antwerp, testified by deposition (Ex. 10-C) that "he (Praast) is marine superintendent for Isbrandtsen and appointed from America * * * I know that Praast is assigned by Isbrandtsen as Dens * * * and also Mr. Gielen told me that this was the boss and that I should comply with his orders."

This testimony clearly indicates the importance which the European agents attached to any "suggestions" by Praast and their concept of the extent of his authority to act on behalf of Isbrandtsen. That there was basis for attaching such importance to Praast's position is evidenced not only by the letters from the President and Vice-President of Isbrandtsen to the European agents describing Praast as "Supervisor of our Far Eastern operations" and outlining the nature of his duties (Exhs. 14-J-L01, 02, 03a), but also by the fact that Praast, in making his reports to the company, communicated directly with the President and Vice-President (Exhs. 14-J-L05, 07, 09, 12).

In addition Praast described himself, in an application for a permit to travel from Antwerp to Bremen, as "Marine Superintendent" of Isbrandtsen. While this statement, in and of itself, is incompetent as proof of the extent of his authority, in the absence of proof of specific approval of it by Isbrandtsen, it must be given weight in evaluating Praast's testimony and his subsequent attempt to characterize himself as a relatively minor and unimportant employee of Isbrandtsen. Praast was Isbrandtsen's "alter ego" in Europe.

We now come to the question of Captain Praast's responsibility for the condition of the stowage in No. 2 lower hold. It is Isbrandtsen's contention that Praast had no authority to exercise any degree of supervision over the stowage of cargo and that the Master of the ship has the ultimate authority with respect to all problems of stowage abroad his vessel even, under certain circumstances, to the exclusion of the owner. At the trial, Praast testified that he had nothing to do with determining where particular items of cargo were to

be stowed but that he was concerned solely with the problem of conserving space for the loading of cargo bookings at other ports on the route to the Far East. In spite of this denial by Praast of responsibility, there is testimony that he acted in a supervisory, rather than in a purely advisory capacity. Shortly after his arrival in Europe, Praast received instructions to go to Bremen "for the purpose of obtaining the necessary large wooden beams which were to be used as shoring for the locomotives." He remained in Bremen until two days before the loading of the locomotives was completed. Otto Girndt who was employed as an inspector by the company handling the loading of the Fanning in Bremen, testified by deposition that as far as he knew "Praast had nothing to do with the supervising of the loading of the cargo" but that he was present at conferences with the master of the ship and the stevedores. Girndt also testified that he himself supervised the loading of the cargo at Bremen. Obviously, he did not intend to give the impression that he determined where the various items of cargo were to be stowed. The making of these decisions was within the province of the ship's officers, not the stevedores who performed the mechanical operation of loading the cargo. The fact that Praast did not transmit orders personally to the stevedores does not prove that he had no part in the loading of the cargo. In fact, two members of the crew have testified to the contrary.

Markley, the third mate, testified that normally the chief officer is the one who supervises the stowage of cargo but that he could not recall that the Fanning's chief mate had anything to do with the stowage of cargo at Bremen. Although he had no recollection of specific things that Captain Praast said or did while the ship was in Bremen, he testified that Praast "was in charge of loading the cargo" (Ex. 5-B, p. 11), and superintended the preparations for taking on the locomotives. Hanes, a seaman, testified that it was difficult for him to determine who was in charge but that "the man who appeared to be in charge was Captain Praast" and that Pra-

ast was the one who gave orders to the German stevedores in respect to the loading and securing of the locomotives (Ex. 6, p. 12). Contrary to Isbrandtsen's contention, the testimony of Captain Jensen, the master of tthe Fanning, does not establish that the Army was in charge of the loading and stowage of the locomotives and that Praast had nothing to do with it. Jensen testified that Praast was the representative of the company and that "he was there to see the locomotives and everything, and shipping and booking was done the proper way" (Ex. 25, p. 363). He also testified that Praast merely consulted with him as to cargo problems in Bremen but that by the time the ship arrived in Rotterdam, he had the cargo plan made up. The Army had nothing to do with the selection of the place or holds for the stowage of the cargo in Bremen but merely made arrangements with the stevedores to load the cargo. According to Jensen, instructions to the stevedores as to the placing of the various items of cargo were "made up between the mate and Captain Praast" (Ex. 25, p. 396).

It is apparent that, in their anxiety to get the new route to the Far East off to a good start, Isbrandtsen sent Captain Praast to Europe to make certain that the stowage of cargo on board the Fanning, which was to inaugurate the new route, was carried out with an eye to conserving as much space as possible for the loading of cargo at all ports along the route, and that, to accomplish this, Praast was given far more than the mere advisory functions.

After Praast left Bremen, he rejoined the Fanning upon its arrival in Rotterdam. It was here that Captain Jensen announced that he was no longer capable of exercising command. The owners were advised of the situation and Captain Fitzgerald was sent by plane from New York to relieve Jensen. Fitzgerald was delayed because of weather conditions; Praast, upon Isbrandtsen's suggestion, sought to take command for the journey from Rotterdam to Antwerp but permission was refused by the American Consul because Praast was not an American citizen. Arrangements were then made to have

Captain Jensen nominally in command with Praast aboard "as an observer." In spite of his own testimony at the trial that Jensen was incapable of exercising the duties of a master; Praast insisted nevertheless that Jensen remained in command of the ship although "he didn't take any active part", and that he himself was aboard not to advise the captain, but as an observer. He did admit, however, that he was giving the orders through the medium of Captain Jensen, and that he himself was in actual command of the ship from Rotterdam down to Antwerp (SM p. 406). Thus, command of the ship was entrusted, not to the first mate who would ordinarily be expected to assume the duties of the master in an emergency, but to Praast whose function Isbrandtsen now seeks to restrict to that of the mere giving of advice.

The new master, Captain Fitzgerald, came aboard the Fanning to take over command at about 9:30 a.m. on Monday, February 17th, three days after the arrival of the ship in Antwerp.

When Captain Fitzgerald went aboard, Captain Praast was on the ship. Cargo was being taken on. Captain Fitzgerald received no cargo papers, when he relieved Captain Jensen of the ship's papers, logbooks, accounts and the like. The mate had no papers concerning the cargo which was coming aboard. Later, on Wednesday, February 19th, Captain Fitzgerald was informed that Praast had the cargo papers; upon his request for them Praast gave him papers "on the letterhead, denoting * * * cargoes that were coming aboard" (SM p. 129). There were a lot of things to be done aboard the ship and according to Captain Fitzgerald they took up most of his time. He "depended on Captain Praast and also the chief officer" (SM p. 130) and Praast assured him that they were getting the finest stowage job one could get in Europe, that the stevedores did a fine job and everything was going all right. Captain Praast had started the stowage when Captain Fitzgerald came aboard to relieve Jensen; it was Fitzgerald's understanding from Praast that he would be there until the ship left Antwerp; he was taking care of the stevedores and ordered them down in the morning. Captain Fitzgerald did not change this even though he was Master of the vessel; for, he testified, "I had no authority to change it" (SM p. 131). He let Praast, with the chief mate, continue to handle the stevedores and the loading.

We have also the statements of the stevedores and agents at Antwerp as to Captain Praast's activities while the ship was in that port. In June and July, 1949, an investigation was conducted by the Judicial Police in Antwerp into the loading of cargo from February 14 to February 22, 1947. During this investigation, the following witnesses were examined; Lambert Gielen, whose stevedoring firm handled the loading of cargo; Hermanns Schrender, a longshoreman employed by Gielen; Marcellus Hoffbauer, chief tally-clerk for Gielen; and Edgard Lefebvre, manager of Dens Ocean, Isbrandtsen's agent in Antwerp. The only logical conclusion to be drawn from the testimony of these four men is that the stowage at Antwerp was accomplished under the active supervision of Captain Praast, and pursuant to his instructions. Gielen testified that his firm had been instructed by Dens Ocean to load the Fanning and that he was told to "follow up the instructions of Captain Praast, who was the representative for Isbrandtsen, in Belgium" (Ex. 10-C, p. 10). He testified that he was also told that, in the event of a dispute as to the method of stowage, the opinion of Praast always prevailed. Schrender testified that he knew Praast to be marine superintendent for Isbrandtsen, that Praast was usually present at all times during the loading of an Isbrandtsen ship, that he supervised the loading and stowage operations, and that he usually gave the instructions for stowing because it was easier to converse with him since he spoke Flemish and because "he was after all the boss to whom we had to listen" (Ex. 10-C, p. 12). Hoffbauer also testified that he knew Praast to be the marine superintendent for Isbrandtsen, and that his job consisted of "the supervising of the loading, to verify the place, the stowage and departure of the vessels"

(Ex. 10-C, p. 13). He testified that Praast would obtain from him information as to the cargo to be loaded, determine the place where each parcel of cargo was to be stowed and then advise the foreman accordingly. Finally, Lefebvre testified that Praast was known to Dens Ocean Co. as the general representative of Isbrandtsen in Europe and that "as far as we know the supervision of the loading (of the Fanning) occurred entirely under Praast's guidance" (Ex. 10-C, p. 25).

In March 1950, after the police investigation, the depositions of these same four witnesses were taken pursuant to a commission rogatory. This testimony constituted an obvious attempt to create the impression, contrary to their previous testimony, that Praast acted as a conduit for the transmission of the instructions of the captain to the stevedores and that he was not the actual supervisor of the loading and stowage operations. There is a marked discrepancy in the testimony given on these two occasions. More than eight months intervened between the police investigation and the taking of the depositions. The testimony given at the police investigation is accepted as the true version of the nature and extent of Praast's activities during the loading of the Fanning at Antwerp.

Finally, there are letters written by Captain Praast and by the European agents to Isbrandtsen reporting on Praast's activities in connection with the Fanning. On February 15, 1947, Praast wrote a letter to the Isbrandtsen home office (Ex. 14-J-L48) stating that the loading of the Antwerp cargo had commenced. He wrote that he would send a plan of the cargo loaded so far. The tone of this letter indicates that Praast had far more to do with the stowage of cargo than merely giving advice when it was requested of him. In another letter dated February 16, 1947, Praast reported that the locomotives and tenders in Nos. 1, 2 and 4 lower holds could only be overstowed with certain cargoes and that he was "attending to this in Antwerp" (Ex. 14-J-L49). In a letter dated February 28, 1947, Isbrandtsen was informed that difficulties were encountered in loading the

Antwerp cargo due to the broken stowage necessitated by the presence of the locomotives and tenders in the holds but that "under instructions from Captain Praast everything finally developed satisfactorily" (Ex. 14-J-L59). Praast's reports to Isbrandtsen brought the stowage situation directly to their attention and within their knowledge.

Their agents also wrote on February 28, 1947 advising them that

"It has been no easy matter, with the locomotives and tenders in the holds, to arrange appropriate stowage in the 3 holds allocated for the Antwerp cargo, but under instructions from Captain Praast everything finally developed satisfactorily, although it proved necessary for the stevedores to erect platforms" (Ex. 14-J-L59).

It was known to the agents that stowage in the 3 holds had been "allocated for the Antwerp cargo." This did not refer only to the locomotives and tenders, for alone they did not require platforms; it referred to all of the Antwerp cargo including the acid and chemicals.

Isbrandtsen took no steps to correct any misinterpretation, by either Captain Praast or by their European agents, of the nature and extent of Praast's authority; it is found that Praast was acting within the limits of that authority in spite of Isbrandtsen's statements to the contrary.

According to Captain Praast, at one time during the loading of the cargo at Antwerp, he was on the fore deck by No. 2 hatch when a sling containing large black drums came aboard. A representative from the agents was also present; Praast asked him what was in the drums. He testified that he was told they contained a harmless powder. The drums went into the No. 2 hold without any further investigation by Praast (SM pp. 429–430). But, Praast also testified that when the ship was in Rotterdam he learned that sulphuric acid was booked for shipment aboard the Fanning and that he had objected to the booking of this cargo; that he had asked the agents in Rotterdam to have it cancelled (SM p. 429). He testified that he received

no definite assurance that it had been cancelled.

However, an entirely different version of the sulphuric acid booking was given by Lefebvre, manager of Dens Ocean at the investigation by the Judicial Police in Antwerp. He testified that Vinke called from Rotterdam at Praast's request and said that the sulphuric acid could not be loaded because it was in *glass containers* and that he was told by Dens that they would talk the matter over with Captain Praast upon his arrival in Antwerp since they had already obtained authorization from Isbrandtsen to load this cargo. Lefebvre also testified that, when Praast learned that the acid was in metal drums and not glass containers, he withdrew his objection. (Ex. 10–C, pp. 24–25).

▮ Even if we were to accept Praast's version, the best that can be said is that he closed his eyes to the realities when he permitted the black drums to be loaded without making any investigation to ascertain the nature of their contents. He knew that sulphuric acid had been booked; he did not know definitely that his request to cancel it had been complied with. He knew that sulphuric acid was usually packed in drums. In spite of this, he testified that it did not occur to him to question the statement that these particular drums contained a harmless black powder. In view of the circumstances, his story is rejected. We find that the sulphuric acid was stowed in lower No. 2 hold either at Praast's express directions or with his knowledge.

One possible explanation of the negligent stowage of sulphuric acid may be found in Isbrandtsen's cargo policy with respect to this voyage inaugurating the new Far Eastern route. In the letter to Vinke & Co. introducing Capt. Praast (Ex. 14–J–L01), it was stated that Crinkley, the Vice-President of Isbrandtsen, has "taken the occasion to explain in some detail to Capt. Praast the background of our operations as to * * * our willingness to take reasonable risks where we believe the prospects justify." On January 13, 1947, Praast recommended, in a letter to Crinkley, that "the New Line should accept iron and cement as the largest export out of Antwerp consist of those cargoes. That once the shippers can be convinced that regular sailings are maintained there will be a better chance of getting general cargo." (Ex. 14–J–L12). In answer, Crinkley informed Praast that "in getting this new service started we must look for whatever cargo is offering and when it is worthwhile, attempt to close it. I do not think that the circumstances are such that in advance we can say we will only take certain cheap cargo and hope eventually more worthwhile cargo will become available." (Ex. 14–J–L19).

This policy was put into actual practice in connection with a cargo of bitumen to be loaded at Suez. Captain Praast was advised of the booking of this cargo in a letter from Vinke & Co. dated Jan. 21, 1947 (Ex. 14–J–L18). He wrote letters to Isbrandtsen on February 15th and 16th advising them that this cargo could not be loaded because cargo already loaded precluded its proper storage. (Ex. 14–J–L48, 49). These letters led to an exchange of cables, with Isbrandtsen insisting that the cargo had to be loaded and Praast equally insistent that it could not be taken on (Ex. 14–F–95, 107, 109, 110, 112, 113). On February 18th, Praast sent a wire to Isbrandtsen saying that the loading of the cargo of bitumen was impossible because it would be "too dangerous in every way" (Ex. 14–F–109). On February 20th, Isbrandtsen sent a wire to Vinke & Co. stressing the need for accepting this cargo because of the heavy liability which would be entailed in the event of a failure to load it (Ex. 14–F–112). Praast remained adamant in his insistence that the bitumen could not be loaded but Isbrandtsen prevailed and obtained the Master's consent to take the bitumen aboard. When judged in light of this attitude on the part of Isbrandtsen, Praast's failure to investigate when he saw the drums being loaded on board at Antwerp is understandable. He realized that the owners' interest in proper stowage of cargo to insure safety was subordinate to their desire to load any cargo which could be obtained.

▮ We come then to consider whether Isbrandtsen is entitled to limit

the liability to the value of its interest in the Fanning after the disaster and her pending freights, 46 U.S.C.A. § 183 et seq. Here, the burden is upon Isbrandtsen of proving that the damage to the cargo was caused "without the privity or knowledge" of Isbrandtsen. We have concluded that it has not sustained this burden.

 It is urged on behalf of Isbrandtsen that even though it be found that Captain Praast was acting in such a capacity for Isbrandtsen as to preclude it from claiming exoneration under the Fire Statute, the evidence establishes that the home office of Isbrandtsen in New York had no knowledge of the improper stowage and that it was not done at their specific direction or expressed approval. But it has been found that Captain Praast was performing with authority duties of a managerial nature rather than merely functioning in a technical or clerical capacity. He was employed by Isbrandtsen in a capacity to make it chargeable with his faults and neglects. Cf. Williams S. S. Co. Inc. v. Wilbur, 9 Cir., 9 F.2d 622, certiorari denied 271 U.S. 666, 46 S.Ct. 482, 70 L.Ed. 1140; Great Atlantic & Pacific Tea Co. v: Lloyd Brasileiro, 2 Cir., 159 F.2d 661. Isbrandtsen is privy to the faults of Captain Praast so as to preclude it from claiming the benefits of the Limitation of Liability Act as well as the Fire Statute.

 The evidence establishes that a clerk for Isbrandtsen's agents in Bremen, General Steam Navigation Company, issued a General Steam Navigation Company form of bill of lading, placing one copy aboard the Fanning and sending two copies to Isbrandtsen and two to Vinke. There was a form of bill of lading in use for commercial shipments which had been provided the Captain of the Fanning and the use of it had been directed. The General Steam Navigation Company was without authority to issue any bill of lading other than on Isbrandtsen's authorized form. It is elementary that absent authority vested in General Steam for the substitution and issuance of their own form, it attached no liability to Isbrandtsen. The General

Steam bill of lading was never ratified or accepted by Isbrandtsen or the Government as binding on either of them. It is found that Exhibit D was the customary form of bill of lading used at the time by Isbrandtsen.

The parties never departed from or altered their agreement that the shipment was covered by the Government form of bill of lading. This form (Claimants Ex. 27–A) by its terms was "subject to the same rules and conditions as govern commercial shipments made on the usual forms provided therefor by the carrier" (Clause 2 of Cl. Ex. 27–A). It was the Isbrandtsen form and not the General Steam form which was forwarded to the United States Army to be used with, attached to and made part of the Government bill of lading which was issued to cover the shipment. The Government in fact used the Isbrandtsen form and incorporated it into the Government form (Cl. Ex. 4–A; Cl. Ex. 4–C). It is concluded that the Government form (Cl. Ex. 27–A), as modified by the provisions of the Isbrandtsen form (Cl. Ex. 27–B) which establishes the terms and conditions under which the shipment was made.

 It is true that the contract of carriage was made directly by the Executive Vice President of Isbrandtsen (M. S. Crinkley) and Col. Lowry of the United States Army, but it is not disputed that the document fixing the rights of the parties with respect to the carriage was a Government bill of lading (SM p. 109). The Government may not invoke the doctrine of personal contract as superseding the fire statute. Pendleton v. Benner Line, 246 U.S. 353, 38 S.Ct. 330, 62 L.Ed. 770; Luckenbach v. W. J. McCahan Sugar Refining Co., 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170. That doctrine has been applied "only to private charter parties executed by the owner." Earle & Stoddart Inc. v. Ellerman's Wilson Line, Ltd., 287 U.S. 420, 429, 53 S.Ct. 200, 202, 77 L.Ed. 403. Isbrandtsen did not by contract or by the terms of the Government bill of lading waive its right to the benefit of statute limiting liability. The Government bill of lading contains no expressed limitation

of the carrier's liability, but as had been pointed out Clause "2" provides the shipment subject to the same rules and conditions as in the usual forms used by the carrier. The Isbrandtsen usual form, which we have found to be (Ex. 4-C) provides in art. 1(a) that the carrier shall be entitled to the full benefit of the Fire Statute and the Statute Limiting Liability.

It is urged by Isbrandtsen that by Clause 1 of its bill of lading, its liability for the loss of the cargo involved is limited to $500 for each customary freight unit, consisting of one locomotive and tender or a total of $10,000 for the 10 "units" comprising the entire shipment.

The Isbrandtsen bill of lading provided in Clause 1, that

"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States of America, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act."

The $500 limitation of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304 (5), provides, insofar as herein applicable, as follows:

"Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency * * *."

In addition to incorporating by reference the above-mentioned statutory $500 limitation, there is set forth in Clause 17 a limitation provision almost identical with the above statutory limitation. Insofar as here applicable it reads as follows:

"In case of any loss or damage to or in connection with goods exceeding in actual value $500 lawful money of the United States, per package, or, in case of goods not shipped in packages, per customary freight unit, the value of the goods shall be deemed to be $500 per package or per unit, on which basis the freight is adjusted and the Carrier's liability, if any, shall be determined on the basis of a value of $500 per package or per customary freight unit * * *."

But, the application of the monetary limitation upon the amount of a carrier's liability contained in Section 1304 (5) is confined to carriage by sea to or from ports or places in the United States. Waterman S. S. Corp. v. United States Smelting, Refining & Mining Co., 5 Cir., 155 F.2d 687, certiorari denied 329 U.S. 761, 67 S.Ct. 115, 91 L.Ed. 656; Globe Solvents Co. v. The California, 3 Cir., 167 F.2d 859, certiorari denied 335 U.S. 844, 69 S.Ct. 67, 93 L.Ed. 394. It was not applicable to the shipment here involved which was moving from Bremen, Germany to Pusan, Korea.

The provisions in the Isbrandtsen bill of lading lessening its liability for losses caused by its negligence is void and invalid; it has not been authorized by statute of the United States and it was here that the contract of carriage was made. The Liverpool & Great Western Steam Co. Ltd. v. Phoenix Ins. Co., 129 U.S. 397, 9 S.Ct. 469, 32 L.Ed. 788. The Carriage of Goods by Sea Act has not carved out a special statutory exception to the general rule that common carriers cannot stipulate for immunity from their own or their agent's negligence. United States of America v. Atlantic Mutual Insurance Co., 1952, 343 U.S. 236, 72 S.Ct. 666.

Upon the foregoing which constitute the findings of fact made herein, the following are set forth as

Conclusions of Law.

1. This court has jurisdiction of the petition filed herein.

2. The petitioner, Isbrandtsen Company, Inc., is guilty of neglects within the meaning of the Fire Statute, 46 U.S.C.A. § 182,

which caused the fire that damaged the Government Cargo of locomotives and tenders and is liable therefor to the Government.

■ We have found that Isbrandtsen was concerned more with the success of the new operation than with the safety of the ship and its cargo. With its expressed policy of accepting any and all cargo, Isbrandtsen had an obligation to make certain that the necessary precautionary steps were taken to insure maximum safety. Accinanto, Ltd. v. Cosmopolitan Shipping Co., D.C., 99 F.Supp. 261. By its failure to fulfill that obligation, Isbrandtsen became liable for the damage resulting from the negligent stowage.

■ 3. That Captain Charles Praast was a supervisory representative of Isbrandtsen and his neglects are attributable to Isbrandtsen in determining the application of the Fire Statute, 46 U.S.C.A. § 182 and to prevent limitation of liability by Isbrandtsen pursuant to 46 U.S.C.A. § 183; and Captain Praast was guilty of faults and neglects contributing to the disaster which make the Fire Statute inapplicable to Isbrandtsen's liability for damage to the cargo in suit and prevent Isbrandtsen from limiting liability therefor. Even if we hold *arguendo* that Isbrandtsen's failure to perform this obligation did not deprive it of the benefit of the Fire Statute, we would arrive at the same conclusion since Captain Praast's negligent supervision of the stowage of cargo was chargeable to Isbrandtsen. As a corporate shipowner, Isbrandtsen was liable for the neglect of its managing officers. While the term "managing officers" does not include the officers and crew of the ship, it is not restricted to the principal executive officers of the corporation. In The Erie Lighter 108, D.C., 250 F. 490, 494, a "managing officer" is defined as "any one to whom the corporation has committed the general management or general superintendence of the whole or a particular part of its business." Captain Praast was described by the President of Isbrandtsen as the Superintendent of the new Far Eastern operation and the letters,

received in evidence, in which Praast's activities were explained in detail, show clearly that he was in charge of this particular part of Isbrandtsen's business in Europe.

■ The test of whether an employee's "privity or knowledge" is attributable to the shipowner under the Limitation Statute, 46 U.S.C.A. § 183, is the same as the test under the Fire Statute. Great Atlantic & Pacific Tea Co. v. Lloyd Brasileiro, 2d Cir., 1947, 169 F.2d 661. Since Praast's neglect is the neglect of Isbrandtsen for the purposes of the Fire Statute, his privity and knowledge are under the facts presented in this case sufficient to deprive Isbrandtsen of the benefit of the Limitation Statute.

4. The Carriage of Goods by Sea Act does not apply to the shipment of locomotives in suit because they were not shipped to or from a United States port and may not validly be incorporated in the contract of carriage herein for the purposes of lessening or reducing petitioner's liability for negligence because not shipped to or from such ports or ports in the territories or possessions of the United States. Waterman S. S. Corp. v. United States Smelting, Refining & Mining Co., 5 Cir., 155 F.2d 687; Globe Solvents Co. v. The California, 3 Cir., 167 F.2d 859.

The statute by its terms is applicable to "carriage of goods by sea to or from ports of the United States". 46 U.S.C.A. § 1300. While the two cases cited hold that the statute may be incorporated into the Bill of Lading when the carriage is between ports of the United States, we have been able to find no authority permitting an extension of the application of the statute to carriage between two ports outside the United States.

5. Isbrandtsen may not validly contract to limit the size of its liability for the loss and damage in suit and any attempts it made to do so are void and of no effect because contrary to public policy and not validated by the Carriage of Goods by Sea Act or any other provision of law. The Ansaldo San Giorgio I v. Rheinstrom

Brothers Co., 294 U.S. 494, 55 S.Ct. 483, 79 L.Ed. 1016.

The Carriage of Goods by Sea Act permits a limitation of liability when the carriage is to or from ports of the United States. It does not authorize a similar limitation when, as here, the carriage is between two ports outside the United States.

6. The claimant, United States of America, is entitled to a decree for the full amount of the damage sustained by its locomotives and tenders as a result of the fire aboard the Fanning on March 13, 1947.