Petition of **WATERMAN STEAMSHIP CORPORATION, a corporation, owner of the vessel S.S. CHICKASAW, for exoneration from and limitation of liability.**

No. 62-1024.

United States District Court
S. D. California, C. D.

Aug. 4, 1966.

Graham, James & Rolph, by Leo J. Vander Lans and Don A. Proudfoot, Long Beach, Cal., for Waterman Steamship Corp.

McCutchen, Black, Verleger & Shea, by Philip K. Verleger, Los Angeles, Cal., by Manuel Real, Eugene Kramer, Los Angeles, Cal., John F. Meadows and Henry Haugen, Admiralty & Shipping Section, U. S. Department of Justice, San Francisco, Cal., Fletcher & Rauch, by Robert A. Fletcher, Los Angeles, Cal., Bigham, Englar, Jones & Houston, by John W. R. Zisgen, New York City, for claimants.

## MEMORANDUM OPINION

CURTIS, District Judge.

On February 7, 1962, the steamship CHICKASAW, owned by the petitioner, Waterman Steamship Corporation, ran hard aground on Santa Rosa Island. She was returning from Japan, bound for Los Angeles, and was attempting a landfall on the south light of the island. It was a dark and rainy night with visibility about one mile, and the captain had been without benefit of a celestial observation for two days because of overcast. There was a substantial loss of her two million dollar cargo, although we are not now concerned with the actual amount thereof. Nevertheless, a number of admiralty actions have been filed, all of which are concerned with the grounding, but in which further proceedings have been stayed pending disposition of the present matter.

Now before the court is a petition for exoneration from liability under § 1304 of the The Carriage of Goods by Sea Act (46 U.S.C.A. § 1300 et seq.) or, in the alternative, a limitation of liability under 46 U.S.C.A. § 183.

In seeking exoneration from liability the petitioner contends that the grounding was the sole result of the negligence of its own crew in the neglect and management of the ship, entitling petitioner to exoneration under COGSA. That the ship's crew was negligent is apparent from the evidence, so apparent in fact that the cargo claimants do not strenuously contend to the contrary. No effort was made to check or repair the fathometer, notwithstanding the fact that it had been reported out of order. The deep sea sounder, whether operative or not, had been chiseled from the deck of the vessel and sold for junk, while in the Orient. No deviation card had been prepared for the radio direction finder in recent years, and there is no indication in the evidence that any deviation at any quadrant was known or calculated in determining radio fixes. The radio fixes obtained shortly before the tragedy were so inconsistent with each other that a reasonable person, especially one with the captain's experience, should have known that he had no accurate knowledge of the location of his vessel. Yet on came the CHICKASAW into the unknown on a foul night, with

poor visibility, and at 16.5 knots, its full cruising speed. No more need be said about the crew's negligence.

■ The cargo claimants contend, however, that the vessel was unseaworthy in some respects which contributed to the grounding, which, if true, would of course prevent petitioner's exoneration. The cargo claimants argue that the CHICKASAW was unseaworthy in that its radar was inoperable. This condition occurred after leaving the home port, and several attempts were made in the Orient to replace a defective cam, but none could be found. As has already been mentioned, the fathometer had been reported inoperable, and the return voyage was commenced without repairing it or checking it to see if, in fact, it were out of order. No deviation card had been prepared for the radio direction finder or the magnetic compass for many years. Each of these deficiencies, so argue cargo claimants, constitute unseaworthiness contributing, to some degree at least, to the grounding.

■ Whatever may be said about the radar, the radio direction finder and the magnetic compass, had the crew been able to rely upon the fathometer, it is unlikely that the grounding would have occurred. The evidence is not clear whether the instrument was actually in a good working condition at the time of the grounding or not. Jensen, the Third Officer, had reported it working erratically in the Inland Sea of Japan and made an entry in the rough log to this effect. There was some testimony, however, that on other occasions it had worked properly and that after the grounding it had been tested and found to be operable. Fathometers are by nature subject to numerous phenomena which temporarily affect their operation. Had the fathometer been turned on immediately prior to the grounding, it might well have functioned properly. But since it had been found by Jensen to be defective on one occasion and had not since been repaired or checked, the uncertainty as to whether it was operable constituted unseaworthiness for which the shipowner was responsible.

Captain Patronis testified that, although he knew of no defect in it, it never occurred to him to use it because he believed the vessel to be in water too deep for the instrument to register. However, Jensen for some little time before the grounding was out on the bridge, peering through the fog and rain, attempting to sight white water. He apparently was concerned as to what was ahead and had he not been under the impression that the fathometer was inoperable, he most certainly would have turned it on.

I find, therefore, that the inoperability of the fathometer, or at least the uncertainty as to its proper operation after it had worked erratically was unseaworthiness which in this case contributed to the grounding. Petitioner is, therefore, barred from exoneration.

Let us consider now the question of limitation of liability.

It is conceded that the shipowner has a duty to use due diligence to make the vessel seaworthy at the commencement of its voyage. It appears that the CHICKASAW visited all ports in the Orient subsequent to the date of the entry in the rough log relating to the defective fathometer. We may assume, therefore, that whenever the western voyage commenced it was in any event after the defect was noted, so that at the commencement of the voyage the Waterman Steamship Corporation had the duty to put the fathometer in a seaworthy condition. Petitioner, however, seeks to limit its liability in this area under the provisions of Title 46 U.S.C.A. § 183, contending that even though there had been a lack of diligence in preparing the vessel for its voyage, it occurred without the privity of knowledge of the owner.

Upon whom in the Orient would the responsibility and authority rest to make necessary repairs and to put the ship in a seaworthy condition before the voyage? The evidence discloses that the Everett Steamship Company was the agent for petitioner in the Orient but only for the purpose of making arrangements and facilitating any work which

the company wished to have done. The authority to initiate the work and the responsibility for having it done rested with the captain. Evidence failed to disclose anyone of higher rank in the managerial hierarchy or with greater authority in the Orient than Captain Patronis. In this case Captain Patronis was also charged with the knowledge of a defectively operating fathometer and did nothing about it.

I find, therefore, from the evidence adduced that Captain Patronis was negligent in failing to check and repair, if need be, the erratically operating fathometer and that this negligence was indeed the negligence of Waterman Steamship Corporation since Captain Patronis was its duly authorized agent to determine the necessity for such repairs and to get them done if need be.

Therefore, petitioner's petition for exoneration or for limitation of liability is denied.