**WATERMAN STEAMSHIP CORPORA-TION et al., Appellant,**

v.

**GAY COTTONS, United States of America and Shalom Baby Wear, Appellees.**

**No. 21767.**

United States Court of Appeals
Ninth Circuit.

April 24, 1969.

As Amended on Rehearing Aug. 5, 1969.

Don A. Proudfott, Jr. (argued), and Leo J. Vander Lans (argued), of Graham & James, Long Beach, Cal., for appellant.

Philip K. Verleger (argued), and Jack D. Fudge, of McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for appellee, Gay Cottons, Inc.

John F. Meadows, San Francisco, Cal., Edwind L. Weisl, Jr., Asst. Atty. Gen., Washington, D. C., Bigham, Englar, Jones & Houston, New York City, Fletcher & Rauch, Los Angeles, Cal., for appellees.

Before JERTBERG and DUNIWAY, Circuit Judges, and TAYLOR, District Judge *.

DUNIWAY, Circuit Judge:

On February 7, 1962, the S.S. CHICKASAW ran aground on Santa Rosa Island, off the coast of Southern California. The island is 40 miles long and 400 feet high. The ship had left Yokohama for Los Angeles on January 27, 1962. No celestial fixes had been obtained after noon on February 5, because of stormy weather. The crew took several fixes with the radio direction finder, which had no recent compensation card, but obtained "wildly divergent" results. The vessel's mechanical sounding device had been pried off the deck in Japan and sold for scrap. The fathometer was not used because Third Mate Jensen thought it was inoperative. He had last tried to use it while the ship was on Japan's Inland Sea on December 25, 1961, when he obtained red flashes all around the dial. He had told the master, Capt. Patronas, that the fathometer was inoperable, but the master did not have it checked at the next port. And the radar was broken, having stopped operating just before the ship's arrival in Japan. It had not been fixed because the repair company in Yokohama could not obtain the necessary part in Japan.

The stranding resulted in total loss of the vessel and substantial loss of cargo. Waterman Steamship Corp., her owner, petitioned for complete exoneration of liability under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1300 et seq.,[1] or alternatively, for limitation of liability to the amount of its limitation fund, about $250,000, under the Limita-

---

* Honorable Fred M. Taylor, United States District Judge, District of Idaho, sitting by designation.

1. 46 U.S.C. § 1304:
"1304(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy * * *. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.
(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship;
(b) Fire, unless caused by the actual fault or privity of the carrier;
(c) Perils, dangers, and accidents of the sea or other navigable waters;
* * * * *
(q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage * * *."

tion of Liability Act, 46 U.S.C. § 183(a).[2] The cargo is claimed to be worth about two million dollars. Determination of the actual damages has been deferred until the question of liability has been resolved.

The District Court entered findings of fact and conclusions of law denying both exoneration and limitation. The court also filed a memorandum opinion which is reported at 265 F.Supp. 595, 1966 A.M.C. 2219. Waterman has appealed pursuant to 28 U.S.C. § 1292(a) (3). See Republic of France v. United States, 5 Cir., 1961, 290 F.2d 395, 397. We affirm.

Although there was substantial evidence that the vessel was unseaworthy because much of its navigational equipment was in poor shape and had not been inspected recently, the District Court rested its denial of exoneration and limitation solely on the ground that Capt. Patronas was negligent in failing to check the fathometer after Jensen had told him it was inoperative, and that Capt. Patronas' negligence was imputed to Waterman because he had been delegated entire managerial responsibility over repairs to the vessel in the Far East. The court specifically rejected findings proposed by appellees [3] which would have found "direct fault" by Waterman because of its failure to inspect and maintain the equipment, on the ground that such findings were beyond the scope of its memorandum decision.

### 1. *The use of Jensen's deposition.*

■ Waterman contends that the district court's conclusion was based primarily on Jensen's deposition, which never should have been admitted. The deposition was taken for less than a day when it was postponed by mutual consent of all parties because Jensen complained of feeling ill. Before the deposition could be resumed, and before appellant conducted any cross-examination at all, Jensen died of a heart attack.

Waterman argues that the lack of cross-examination rendered the deposition inadmissible. It contends that it had no opportunity to ask Jensen about his knowledge that the flashing condition which he noted on the fathometer might have been caused by other factors.[4] However, various experts did testify at the trial that the flashing phenomenon could have been caused by interference from the ship itself, from another ship, from a school of fish, or even from sea turbulence. Besides, it was never contradicted that Jensen did actually think that the fathometer was inoperative. He made an entry in the log to that effect, and Capt. Patronas admitted that Jensen had told him it was not working. Whether or not the fathometer was really in working order was of little consequence; Jensen in fact thought it did not work,

2. 46 U.S.C. § 183(a):

The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not * * * exceed the amount or value of the interest of such owner in such vessel, and her freight then pending * * *."

3. Appellees are claimants whose cargo was lost or damaged in the standing: Gay Cottons, Inc., Shalom Baby Wear, and the United States.

4. Appellees argue that Waterman was not prejudiced by the admission of the deposition because Jensen had earlier given substantially similar testimony at a Coast Guard hearing. This testimony was admitted without objection. Although counsel for appellant was present at the hearing and was given an opportunity to cross-examine, we do not rely on this ground, because Waterman did not have a compelling motive to cross-examine Jensen at that time. *Cf.* Insul-Wool Insulation Corp. v. Home Insulation, Inc., 10 Cir., 1949, 176 F.2d 502, 503–504; Rivera v. American Export Lines, S.D.N.Y., 1952, 13 F.R.D. 27, 29; The Dixie Sword, E.D.N.Y., 1944, 57 F.Supp. 183, 185.

and Capt. Patronas did nothing to change Jensen's opinion. Thus, appellant has not shown that cross-examination would have helped it materially. Under these circumstances, the District Court did not err in admitting the deposition,[5] especially since this case was tried to the court and not a jury.[6]

### 2. Denial of exoneration under COGSA.

■ The District Court was unquestionably correct in denying exoneration because of Capt. Patronas' negligence in failing to check the fathometer. Waterman, however, contends that it was entitled to exoneration at least as to all cargo loaded before December 25, 1962, when Capt. Patronas negligently failed to have the fathometer checked. Waterman argues that exoneration is denied under COGSA for failure to exercise due diligence to make a ship seaworthy only where such failure occurs before or at the beginning of a voyage, and that Capt. Patronas' negligence occurred after the beginning of the voyage, as regards the cargo which had already been loaded.[7] Regardless of the merits of this conten-

tion, Waterman is not entitled to such exoneration because it did not raise the point below.[8] Furthermore, Waterman actually *invited* the error (if it be error) by drafting the very phrase in the findings of fact of which it now complains.[9]

### 3. Limitation of liability—negligence of the Captain.

Under COGSA, 46 U.S.C. § 1304, the lack of due diligence of any employee which occurs before or at the beginning of a voyage and results in unseaworthiness is sufficient to preclude complete exoneration of liability. Under the Limitation of Liability Act, 46 U.S.C. § 183 (a), however, a shipowner is permitted to limit its liability to the value of its ship, plus freight charges, if it can prove that the lack of due diligence to make seaworthy was not within its "privity or knowledge." [10]

But appellees contend that, because the owner's duty to make a vessel seaworthy is nondelegable, any negligence which results in unseaworthiness is presumed as a matter of law to be within the privity and knowledge of the owner. They rely on statements to that effect in Federa-

5. See Derewecki v. Pennsylvania R.R., 3 Cir., 1965, 353 F.2d 436; Gass v. Stinson, Cir.Ct.Mass., 1837, 10 Fed.Cas. pp. 72, 75–76, 5,262; Inland Bonding Co. v. Mainland Nat'l Bank, D.N.J., 1944, 3 F.R.D. 438; Fuller v. Rice, 1853, 70 Mass. (4 Gray) 343, 345; 3 Jones, Evidence § 717, at 1347 (5th ed.1958); McCormick, Evidence § 19, at 41–42 (1954); 5 Wigmore, Evidence § 1390, at 109–11 (3d ed.1940); McCormick, The Scope and Art of Cross Examination, 47 Nw.L.Rev. 177, 187 (1952). *Cf*. Rosenthal v. People's Cab Co., W.D.Pa., 1960, 26 F.R.D. 116. But see Henderson v. Twin Falls County, 1938, 59 Idaho 97, 80 P.2d 801, 802; Nehring v. Smith, 1951, 243 Iowa 225, 49 N.W.2d 831, 834–835; Kemble v. Lyons, 1918, 184 Iowa 804, 169 N.W. 117; City of Chadron v. Glover, 1895, 43 Neb. 732, 62 N.W. 62; Port of N.Y. Authority v. Howell, 1961, 68 N.J.Super. 559, 173 A.2d 310, 317; Best v. Tavenner, 1950, 189 Or. 46, 218 P.2d 471, 474; In re Sweeney's Estate, 1946, 248 Wis. 607, 22 N.W.2d 657.

6. *Cf*. MacDonnell v. Capital Co., 9 Cir., 1942, 130 F.2d 311, 318, cert. denied, 317 U.S. 692, 63 S.Ct. 324, 87 L.Ed. 554.

7. 46 U.S.C. § 1303(1) "The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to * * * [m]ake the ship seaworthy * * *." See Mississippi Shipping Co. v. Zander & Co., 5 Cir., 1959, 270 F.2d 345, 350, vacated as moot, 361 U.S. 115, 80 S.Ct. 212, 4 L.Ed.2d 148; Gilmore & Black, Admiralty 130 (2d ed. 1957).

8. *E. g.*, Minnich v. Gardner, 1934, 292 U.S. 48, 53, 54 S.Ct. 567, 78 L.Ed. 1116; A/S Ludwig Mowinckels Rederi v. Accinanto, Ltd. (THE OCEAN LIBERTY), 4 Cir., 1952, 199 F.2d 134, 145, cert. denied, 345 U.S. 992, 73 S.Ct. 1129, 97 L.Ed. 1400.

9. "[T]he S.S. CHICKASAW was unseaworthy at the commencement of the voyage from *each* port in the Far East to the United States in that * * *." (Emphasis added.)

10. This limitation applies to property damage claims only.

zione Italiana Dei Corsorzi Agrari v. Mandask Compania de Vapores, S.A. (THE PERAMA), 2 Cir., 1968, 388 F.2d 434, 439–440, in States S.S. Co. v. United States (THE PENNSYLVANIA), 9 Cir., 1958, 259 F.2d 458, 474, and in Gilmore & Black, Admiralty 696, 701–02 (2d ed. 1957).[11] The *Perama* language, however, is dictum. The court had found that the lack of due diligence was attributable to employees who were "sufficiently high in the managerial hierarchy of the appellant so that their general and detailed knowledge and their close privity to the repair project was imputed to the corporation." 388 F.2d at 439 n. 6. The *Perama* court cited Gilmore & Black, States S.S. Co., *supra*, and W. R. Grace & Co. v. Charleston Lighterage & Transfer Co. (THE ONE LIGHTER), 4 Cir., 1952, 193 F.2d 539. The latter case involved an old rotting barge which had not been repaired or properly inspected for a number of years. The court in *Perama* ignored several of its own recent cases which recognize that COGSA has different standards from those applicable under the Limitation Act.[12]

The *States Steamship* language was also dictum. The court had found that the negligence was attributable to one Vallet, a "port engineer" who was in charge of maintenance and repair of all the owner's vessels. On a petition for rehearing, we emphasized that we were denying limitation because the lack of due diligence was charged to managing officers of the corporation. We said that we were *not* holding that "in any case where the Steamship Company fails to use due diligence to make the vessel seaworthy at the inception of her voyage, limitation must be denied." 259 F.2d at 471–472. See Avera v. Florida Towing Co. (THE EILEEN ROSS), 5 Cir., 1963, 322 F.2d 155, 163 n. 13, where the court, in discussing this circuit's opinion in Admiral Towing Co. v. Woolen (THE COMPANION), 9 Cir., 1961, 290 F.2d 641, 646–649, said "The 9th Circuit was especially careful not to adopt the broad view suggested in Gilmore & Black, Admiralty, § 10–24, pp. 701–704 (1957), that privity and knowledge for a corporate shipowner is equated with nondelegable duties. See 290 F.2d 641 at 648, and note 6, p. 649."

The Supreme Court, while discussing the Fire Statute, 46 U.S.C. § 182, in Earle & Stoddart v. Ellerman's Wilson Line, Ltd. (THE GALILEO), 1932, 287 U.S. 420, 427, 53 S.Ct. 200, 201, 77 L.Ed. 403, said, "The courts have been careful not to thwart the purpose of the fire statute by interpreting as 'neglect' [in the statutory phrase 'design or neglect of such owner'] of the owners the breach of what in other connections is held to be a nondelegable duty." [13]

11. See also Doughty v. Nebel Towing Co., E.D.La., 1967, 270 F.Supp. 957, 959 (dictum).

12. In Petition of Kinsman Transit Co. (THE MacGILVRAY SHIRAS), 2 Cir., 1964, 338 F.2d 708, 714–716, limitation was granted where a non-managerial employee negligently moored a steamer in Buffalo. The company was headquartered in Cleveland, but at that time had four of its five vessels moored in Buffalo. In Moore-McCormack Lines, Inc. v. Armco Steel Co. (THE MORMACKITE), 2 Cir., 1959, 272 F.2d 873, 876–877, limitation was granted where the corporate owner's managing officers had no notice of the improper stowage of ore in South American ports in violation of the company's own rules. "As was obviously necessary in foreign ports, it was left to those in charge to follow these directions, and if they failed, their failure did not charge the owners with 'privity or knowledge.'"

13. Accord, Hartford Acc. & Ind. Co. v. Gulf Ref. Co., 5 Cir., 1956, 230 F.2d 346, 355 (fire statute case). The phrase "design and neglect" in the fire statute has been held to be equivalent to the "privity or knowledge" of the Limitation Act. See Craig v. Continental Ins. Co., 1891, 141 U.S. 638, 646, 12 S.Ct. 97, 35 L.Ed. 886 (Limitation Act case) ; Great Atl. & Pac. Tea Co. v. Brasileiro (THE POCONE), 2 Cir., 1947, 159 F.2d 661, 664, cert. denied, sub nom. Republic of the United States of Brazil v. Great Atl. & Pac. Tea Co., 331 U.S. 836, 67 S.Ct. 1519, 91 L.Ed. 1849 (fire statute case) ; Consumers Import Co. v. Kawasaki Kisen Kabushiki Kaisha (THE VENICE MARU), 2 Cir., 1943, 133 F.2d 781, 784 (fire statute case); Petition of United States (THE

Notwithstanding the conclusion of Gilmore & Black, we have found no case which has denied limitation of liability because of the negligence of a non-managerial employee. On the contrary, all cases denying limitation of liability to a corporate shipowner have emphasized that the negligence or lack of due diligence to make seaworthy was attributable to managerial personnel.[14] Many

EDMUND FANNING), S.D.N.Y., 1952, 105 F.Supp. 353, 371, modified on other grounds sub nom. Petition of Isbrandtsen Co., 2 Cir., 1953, 201 F.2d 281.

See also The Yungay, S.D.N.Y., 1931, 58 F.2d 352, 353, 356: "But instances of nondelegable duties on the part of the owner * * * are rarely found in limitation of liability issues, and the reason is plain. * * * The act would fail of its purpose, the encouragement of the business of navigation, if full liability should be visited upon owners through the creation and imposition on them of nondelegable duties."

14. See Spencer Kellogg & Sons, Inc. v. Hicks (THE LINSEED KING), 1932, 285 U.S. 502, 510–512, 52 S.Ct. 450, 76 L.Ed. 903; The Malcolm Baxter, Jr., 1928, 277 U.S. 323, 331, 48 S.Ct. 516, 72 L.Ed. 901, affirming 2 Cir., 1927, 20 F.2d 304, and S.D.N.Y., 1921, 55 F.2d 312, 315–316; Federazione Italiana Dei Corsorzi Agrari v. Mandask Compania de Vapores, S.A. (THE PERAMA), 2 Cir., 1968, 388 F.2d 434, 439; McNeil v. Lehigh Valley R. R., 2 Cir., 1967, 387 F.2d 623; China Union Lines, Ltd. v. A. O. Andersen & Co. (THE UNION RELIANCE), 5 Cir., 1966, 364 F.2d 769, 786–788, cert. denied, 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805; Coleman v. Jahncke Service, Inc. (THE CLARIBEL), 5 Cir., 1965, 341 F.2d 956, 960, affirming Greater New Orleans Expressway Comm'n v. Tug Claribel, E.D.La., 1963, 222 F.Supp. 521, 524–525; Avera v. Florida Towing Co. (THE EILEEN ROSS), 5 Cir., 1963, 322 F.2d 155; Admiral Towing & Woolen (THE COMPANION), 9 Cir., 1961, 290 F.2d 641, 646–649 [individual owner]; Petition of Oskar Tiedemann & Co. (THE ELNA II), 3 Cir., 1961, 289 F.2d 237, 239–240; States S.S. Co. v. United States (THE PENNSYLVANIA), 9 Cir., 1958, 259 F.2d 458; Petition of Isbrandtsen Co., 2 Cir., 1953, 201 F.2d 281; The Midland Victory (Petition of United States), 2 Cir., 1949, 178 F.2d 243, 251–253; Austerberry v. United States (THE C. G. R. 180), 6 Cir., 1948, 169 F.2d 583, 593–594; The Cleveco, 6 Cir., 1946, 154 F.2d 605, 613; The Marguerite, 7 Cir., 1944, 140 F.2d 491, 494–495; The New York Marine No. 10, 2 Cir., 1940, 109 F.2d 564; Gunnarson v. Robert Jacob, Inc.

(THE NIMBUS), 2 Cir., 1938, 94 F.2d 170, 172, cert. denied, 303 U.S. 660, 58 S.Ct. 764, 82 L.Ed. 1119; The Silver Palm, 9 Cir., 1937, 94 F.2d 776, 778–779, cert. denied, 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1539; In re Great Lakes Transit Co. (THE GLENBOGIE), 6 Cir., 1936, 81 F.2d 441, 444; Sabine Towing Co. v. Brennan (THE EDGAR F. CONEY), 5 Cir., 1934, 72 F.2d 490, 492; The T. J. Hooper, 2 Cir., 1932, 60 F.2d 737, cert. denied, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571; The Calvert, 4 Cir., 1931, 51 F.2d 494, 498; The Malcolm Baxter, Jr., 2 Cir., 1927, 20 F.2d 304; Texas & Gulf S.S. Co. v. Parker (THE PILOT BOY), 5 Cir., 1920, 263 F. 864, 867–868; In re P. Sanford Ross, Inc., 2 Cir., 1913, 204 F. 248; McGill v. Michigan S.S. Co. (THE PROGRESO), 9 Cir., 1906, 144 F. 788, 794–796; In re Pac. Mail S.S. Co. (THE RIO DE JANEIRO), 9 Cir., 1904, 130 F. 76; Parsons v. Empire Transp. Co., 9 Cir., 1901, 111 F. 202; The Republic, 2 Cir., 1894, 61 F. 109, 112–113; Hudgins v. Mockingbird, Inc., E.D.Va., 1968, 282 F.Supp. 367; Sylve v. E. W. Gravrolet Canning Co. (THE MARGUERITE A), E.D.La.1967, 278 F. Supp. 669, 673; McDonald v. The Barge 204 (THE CARRIE MACK), S.D.Ala., 1961, 194 F.Supp. 383, 389; Petition of Sause Bros. Ocean Towing Co. (THE CURLEW), D.Or., 1960, 193 F.Supp. 14; In re Henry DuBois' Sons Co. (THE TRENTON), S.D.N.Y., 1960, 189 F.Supp. 400; Petition of United States (THE EDMUND FANNING), S.D.N.Y., 1952, 105 F.Supp. 353, 369, modified on other grounds sub nom. American Tobacco Co. v. Katingo Hadjipatera, S.D.N.Y., 1948, 81 F.Supp. 438, 445–446; The Ruth Conway, D.Md., 1947, 75 F.Supp. 514; Hockley v. Eastern Transp. Co. (THE CALVIN), D.Md., 1935, 10 F.Supp. 908, 917–918; The City of Brunswick, D. Mass., 1934, 6 F.Supp. 597, 601–602; The Vestris, S.D.N.Y., 1932, 60 F.2d 273, 280; Dexter-Carpenter Coal Co. v. New York, O. & W. Ry. (THE O. & W. 23), S.D.N.Y., 1931, 50 F.2d 270; The Miami, E.D.N.Y., 1930, 43 F.2d 562; The Argent, S.D.N.Y., 1915, 1940 A.M.C. 508; Sanbern v. Wright & Cobb Lighterage Co. (THE STAR), S.D.N.Y., 1909, 171 F. 449, 455, aff'd per curiam, 2 Cir., 1910, 179 F. 1021; Oregon Round Lumber Co.

cases have granted limitation of liability because the corporate owner proved that none of its managerial personnel were negligent or had notice of any negligence.[15]

■ We conclude that standards under the Limitation Act are different from those under COGSA. The Shipowner is entitled to limitation of liability if it can show that the lack of due diligence is not within its "privity or knowledge." As to corporate owners, this has been interpreted to mean that the negligence must be that of a "managing officer" or, more properly, a "supervisory employee."

"While the cases generally speak of the knowledge of managing officers as being the knowledge of the corporation, the real test is not as to their be-

ing officers in a strict sense but as to the largeness of their authority." In re P. Sanford Ross, Inc., 2 Cir., 1913, 204 F. 248, 251.

"[A managing officer is] any one to whom the corporation has committed the general management or general superintendence of the whole or a particular part of its business." The Marguerite, 7 Cir., 1944, 140 F.2d 491, 494. Petition of United States (THE EDMUND FANNING), *supra*, 105 F. Supp. at 371. See also Coryell v. Phipps (THE SEMINOLE), 1943, 317 U.S. 406, 410–411, 63 S.Ct. 291, 87 L. Ed. 363.

The District Court recognized that the negligence of a master is normally not imputed to the owner,[16] but concluded that, because "entire managerial respon-

v. Portland & Asiatic S.S. Co. (THE MONARCH), D.Or., 1908, 162 F. 912, 921–922. *Cf.* Great Atl. & Pac. Tea Co. v. Brasileiro (THE POCONE), 2 Cir., 1947, 159 F.2d 661, 664, cert. denied, Republic of the United States of Brazil v. Great Atlantic & Pacific Tea Co., 331 U.S. 836, 67 S.Ct. 1519, 91 L.Ed. 1849 [fire statute case]; Williams S.S. Co. v. Wilbur (THE WILLSOLO), 9 Cir., 1925, 9 F.2d 622 [fire statute case]. Although the court in W. R. Grace & Co. v. Charleston Lighterage & Transfer Co. (THE ONE LIGHTER), *supra*, 193 F.2d 539, 543, did not say that the the lack of due diligence had to be within the privity or knowledge of the owner, the facts of that case show that it was, because the barge had not been adequately inspected or repaired for several years.

15. United States v. Sandra & Dennis Fishing Corp., 1 Cir., 1967, 372 F.2d 189, 198–199, cert. denied Roberts v. United States, 389 U.S. 836, 88 S.Ct. 48, 19 L. Ed.2d 98; Petition of Kinsman Transit Co. (THE MacGILVRAY SHIRAS) 2 Cir., 1964, 338 F.2d 708, 714–716; Port of Pasco v. Pacific Inland Nav. Co., 9 Cir., 1963, 324 F.2d 593; Petition of Oskar Tiedemann & Co. (THE ELNA II), *supra*, 289 F.2d at 241; Moore-McCormack Lines, Inc. v. Armco Steel Co. (THE MORMACKITE), 2 Cir., 1959, 272 F.2d 873, 876–877; The South Coast, 9 Cir., 1934, 71 F.2d 891; Southern Pac. Co. v. United States (THE SAC CITY), 2 Cir., 1934, 72 F.2d 212, 214–215; The Princess Sophia, 9 Cir., 1932, 61 F.2d 339; The Rambler, 2 Cir.,

1923, 290 F. 791; The Annie Faxon, 9 Cir., 1896, 75 F. 312; Petition of Marina Mercante Nicaraguense, S.A., (THE EL SALVADOR), S.D.N.Y., 1965, 248 F. Supp. 15, 25, modified on other grounds, 2 Cir., 1966, 364 F.2d 118, cert. denied, Marine Mercante Nicaraguense, S.A., v. McAllister Bros., Inc., 385 U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544; American Tobacco Co. v. The Katingo Hadjipatera, *supra*, 81 F.Supp. at 445; The Iowa, D.Or., 1940, 34 F.Supp. 843, 847–848; The City of Bangor, D.Mass., 1936, 13 F. Supp. 648; The Yungay, S.D.N.Y., 1931, 58 F.2d 352, 355–356; The Erie Lighter 108, D.N.J., 1918, 250 F. 490, 494–495; The Ariel, S.D.N.Y., 1940, 33 F.Supp. 573, 575–576 (dictum), aff'd, 2 Cir., 1941, 119 F.2d 866; The Colima, S.D.N.Y., 1897, 82 F. 665, 679. Cf. Earle & Stoddart v. Silverman's Wilson Line, Ltd. (THE GALILEO), 1932, 287 U.S. 420, 425–428, 53 S.Ct. 200, 77 L. Ed. 403 [fire statute case]; Albina Engine & Mach. Works v. Hershey Chocolate Corp. (THE ROBERT LUCKENBACH), 9 Cir., 1961, 295 F.2d 619 [fire statute case]; Porto Rico Lighterage Co. v. Capitol Const. Co. (THE EUREKA), 1 Cir., 1961, 287 F.2d 507.

16. "[T]he term 'managing officers' does not include the officers and crew of the ship * * *." Petition of United States (THE EDMUND FANNING), *supra*, 105 F.Supp. at 371. See also American Tobacco Co. v. The Katingo Hadjipatera, S.D.N.Y., 1948, 81 F.Supp. 438, 445. Cf. 46 U.S.C. § 1304(2) (a).

sibility" had been delegated to Capt. Patronas to oversee repairs in the Far East, he was a "managing officer" with respect to decisions made within that delegation of authority. Consequently, his failure to check the fathometer after Jensen had said it was inoperative was within the "privity and knowledge" of Waterman.[17] Waterman does not contest the finding that its "entire managerial responsibility as respects repairs" had been delegated to Patronas. Instead, it only contests the conclusion that such delegation is sufficient to deny limitation of liability.

Although Capt. Patronas was the master of the S.S. CHICKASAW, his negligence, as found by the court, did not arise out of his authority over the vessel on the high seas. Instead, the finding rests on his failure to have the fathometer checked in the next port after Jensen had told him that it was inoperative. Certainly there is language in some of the cases which would indicate that limitation might be denied under such circumstances. Thus, in Spencer Kellogg & Sons, Inc. v. Hicks (THE LINSEED KING), 1932, 285 U.S. 502, 511–512, 52 S.Ct. 450, 453, 76 L.Ed. 903, the Supreme Court distinguished La Bourgogne, 1908, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973, as involving the master's failure to obey rules on the high seas, and said:

> "There is no analogy between such a situation and that presented in the cited cases where the emergency must be met by the master alone. In these there is no opportunity of consultation or cooperation or of bringing the proposed action of the master to the owner's knowledge. The latter must rely upon the master's obeying rules and using reasonable judgment."

In Admiral Towing Co. v. Woolen (THE COMPANION), 9 Cir., 1961, 290 F.2d 641, 648, limitation was denied where the individual owner of a tugboat knew that the master was going to hire a crewman, but made no attempt to insure that the crewman was competent. In dictum, we said that limitation would be granted even where the master has been given unlimited authority but his negligence was "instantaneous negligence * * * over which the shipowner could not possibly exercise control." In The Argent, S.D.N.Y., 1915, 1940 A.M.C. 508, 509, Judge Hough said:

> "The philosophy of shipowners' limitation seems to me this: There are so many things which shipowners must do by deputy, and must have done at great distances and under circumstances where human fallibility is peculiarly prone to produce error, that they long have been saved by statute from the consequences of their agents' acts."

Yet it is clear that an owner cannot close its eyes to what prudent inspections would disclose. An owner must avail itself of whatever means of knowledge are reasonably necessary to prevent conditions likely to cause losses. "If lack of actual knowledge were enough, imbecility, real or assumed, on the part of owners would be at a premium." The Argent, *supra*, 1940 A.M.C. at 509.[18]

---

17. See Finding of Fact 6:
   "It was the Waterman Steamship Corporation's obligation to exercise due diligence to make the S.S. CHICKASAW seaworthy at the commencement of the voyage from the Far East. This included an obligation that the ship's navigational equipment be put in a suitable state of repair before going to sea * * *. As to repairs, Waterman placed all authority, including authority to decide whether repairs should be made at all, with the master, and had in the Far East no supervisory or managerial personnel to carry out its obligation to exercise due diligence to make the vessel seaworthy. Waterman therefore had delegated to the master its entire managerial responsibility as respects such repairs at the commencement of this voyage and therefore Waterman had knowledge, privity, and is at fault for the decision not to repair the fathometer * * *."

18. See The Cleveco, *supra*, 154 F.2d at 613; The Silver Palm, *supra*, 94 F.2d at 780; In re P. Sanford Ross, Inc., *supra*, 204 F. at 248; Greater New Orleans Expressway Comm'n v. Tug Claribel, *supra*, 222 F.Supp. at 524; In re Henry Du-

However, we must be careful to avoid indiscriminately transferring to the case at bar the broad language of other cases with vastly different fact situations.[19] The great majority of the cases denying limitation of liability have involved old barges, tugs, and other vessels obviously more capable of control by the home office than a freighter thousands of miles away.[20] And most of these cases in-volved either a long-standing practice of failing adequately to inspect the vessel, or otherwise to exercise control over activities in the home port.[21]

In contrast, limitation of liability has been granted much more often where the vessel involved was a large ship and the negligence did not occur in the home port or in a drydock.[22] Limitation has been

Bois' Sons Co. (THE TRENTON), *supra*, 189 F.Supp. at 403; Hockley v. Eastern Transp. Co. (THE CALVIN), *supra*, 10 F.Supp. at 917–918. *Cf.* Great Atl. & Pac. Tea Co. v. Brasileiro (THE PO-CONE), *supra*, 159 F.2d at 665 [fire statute case].

19. "Privity, like knowledge, turns on the facts of particular cases." Coryell v. Phipps (THE SEMINOLE), 1943, 317 U.S. 406, 411, 63 S.Ct. 291, 87 L.Ed. 363.

20. See the following cases, all cited *supra*, n. 14: Spencer Kellogg & Sons, Inc. v. Hicks (THE LINSEED KING) [launch used to ferry workers across the Hudson River]; McNeil v. Lehigh Valley R. R. [barge]; Coleman v. Jahncke Service, Inc. (THE CLARIBEL) [tug and barge]; Avera v. Florida Towing Co. (THE EILEEN ROSS) [tug]; Admiral Towing Co. v. Woolen (THE COMPAN-ION) [tug manned by master and one crewman]; Austerberry v. United States (THE C. G. R. 180) [32-foot launch in drydock]; The Cleveco [tug]; The Marguerite [tug]; The New York Marine No. 10 [tug]; Gunnarson v. Robert Jacob, Inc. (THE NIMBUS) [sailing yacht]; In re Great Lakes Transit Co. (THE GLENBOGIE) [barge]; Sabine Towing Co. v. Brennan. (THE EDGAR F. CONEY) [tug]; The T. J. Hooper [tug]; The Calvert [barge]; Texas & Gulf S.S. Co. v. Parker (THE PILOT BOY) [small freight-carrying steamship plying between Galveston and Corpus Christi]; In re P. Sanford Ross, Inc. [pile driver vessel]; McGill v. Michigan S.S. Co. (THE PROGRESO) [steamship being overhauled]; Parsons v. Empire Transp. Co. [barge]; The Republic [excursion barge]; Hudgins v. Mockingbird, Inc. [fishing vessel]; Sylve v. E. W. Gravrolet Canning Co. (THE MAR-GUERITE A) [42-foot oyster boat]; McDonald v. The Barge 204 (THE CAR-RIE MACK) [barge]; Petition of Sause Bros. Ocean Towing Co. (THE CUR-LEW) [22-foot cabin cruiser]; In re Henry DuBois' Sons Co. (THE TREN-TON) [steam derrick]; The Ruth Con-way [tug]; Hockley v. Eastern Transp. Co. (THE CALVIN) [barge]; Dexter-Carpenter Coal Co. v. New York, O. & W. Ry. (THE O. & W. 23) [barge]; The Miami [steam lighter which sank at berth]; The Argent [barge]; Sanbern v. Wright & Cobb Lighterage Co. (THE STAR) [barge]; Oregon Round Lumber Co. v. Portland & Asiatic S.S. Co. (THE MONARCH) [barge].

21. The following cases involving smaller vessels have granted limitation of liability because the lack of due diligence was not within the privity or knowledge of the corporate owner: Port of Pasco v. Pacific Inland Nav. Co. [barge under repair]; The Rambler [tug]; The Erie Lighter 108 [lighter]. *Cf.* Porto Rico Lighterage Co. v. Capitol Const. Co. (THE EUREKA) [tug]. (All cited *supra*, n. 15.)

22. See LaBourgogne, 1908, 210 U.S. 95, 117–127, 28 S.Ct. 664, 52 L.Ed. 973 [negligent navigation]; Craig v. Continental Ins. Co. (THE ENTERPRISE), 1891, 141 U.S. 638, 646–647, 12 S.Ct. 97, 35 L.Ed. 886 [negligence in towing a vessel]; and the following cases, all cited *supra*, n. 15; United States v. Sandra & Dennis Fishing Corp. [negligent operation of a Coast Guard patrol boat while towing a fishing vessel]; Petition of Kinsman Transit Co. (THE MacGIL-VRAY SHIRAS) [negligent mooring in Buffalo of a steamer owned by a Cleveland company which had four of its five vessels in Buffalo]; Petition of Oskar Tiedemann & Co. (THE ELNA II) [negligent navigation]; Moore-McCormack Lines, Inc. v. Armco Steel Co. (THE MORMACKITE) [improper stowage in South American ports]; The South Coast [cause of sinking unknown; unseaworthiness, if any, not with owner's privity or knowledge]; Southern Pac. Co. v. United States (THE SAC CITY) [negligent navigation]; The Princess Sophia [negligent navigation]; Petition of Marina Mercante Nicaraguensa, S.A. (THE EL SALVADOR) [negligent navigation]; American Tobacco Co. v. The

denied in large ship cases under a variety of circumstances, but we have found no case which has attributed the negligence of the master to the corporate owner.[23]

> "[T]he more restricted the operation in which a vessel is engaged, the greater will be the degree of control which the corporate owner will be required to exercise over master, crew and subordinate shoreside employees. * * * [T]he duty to control increases along with the possibility of control * *." Gilmore & Black, Admiralty (2d ed. 1957) 704, quoted in Avera v. Florida Towing Co. (THE EILEEN ROSS), 5 Cir., 1963, 322 F.2d 155, 165.

The District Court's conclusion that Waterman had privity and knowledge of

Capt. Patronas' failure to have the fathometer checked in Japan because he had sole authority over repairs in the Far East would be a substantial extension from prior cases. Indeed, it would be inconsistent with the recent cases of Petition of Kinsman Transit Co. (THE MacGILVRAY SHIRAS) and (Moore-McCormack Lines, Ltd. v. Armco Steel Co. (THE MORMACKITE), *supra* note 12. We do not believe that such an extension is warranted.[24] Although modern communication and transportation facilities make all acts performed in any foreign port within the potential control of the shipowner,[25] we believe that an extension of the requirement of privity or knowledge to cover all such acts should

Katingo Hadjipatera [negligent stowage; limitation granted to owner]; The Iowa [negligent navigation]; The Yungay [steamship struck reef because the master ignored the owner's instructions to calibrate the compass properly]; The Colima [improper stowage in San Francisco]. *Cf.* Earle & Stoddart v. Ellerman's Wilson Line, Ltd. (THE GALILEO) [fire statute case; improper stowage in New York harbor in a British steamship]; Albina Engine & Mach. Works v. Hershey Chocolate Corp. (THE ROBERT LUCKENBACH) [fire statute case; explosion in freighter being repaired].

**23.** See the following cases, all cited *supra*, n. 14: The Malcolm Baxter, Jr. [owners failed to inspect a ship they had recently purchased]; China Union Lines, Ltd. v. A. O. Anderson & Co. (THE UNION RELIANCE) [same]; Petition of Oskar Tiedemann & Co. (THE ELNA II) [failure of the United States to provide adequate equipment]; States S.S. Co. v. United States (THE PENNSYLVANIA) [port engineer who was in charge of the maintenance and repair of all the owner's ships, knew that the vessel, an old Liberty Ship, was sensitive in cold weather to cracks, but failed to tell the master]; The Midland Victory [government regulations and policy allowed an incompetent crew on a troop transport]; The Silver Palm [owners knew that ship took abnormally long to stop, but failed so to inform the master]; In re Pac. Mail S.S. Co. [improper manning; all Chinese crew could not understand its American officers in an emergency]; Petition of United States (THE ED-

MUND FANNING) [cargo improperly stowed under the supervision of "marine superintendent" whose "duties were of a managerial nature rather than merely functioning in a technical or clerical capacity"]; American Tobacco Co. v. The Katingo Hadjipatera [managing director of charterer insisted on overloading the vessel]; The City of Brunswick [defective repairing under the supervision of the chief inspector and the assistant district manager of the owner, the U. S. Shipping Board Merchant Fleet Corp.]; The Vestris [British owner's marine superintendent in New York knew that vessel was overloaded. Also, the practice of overloading was so frequent and so long continued that the owner was chargeable with knowledge]. *Cf.* Great Atl. & Pac. Tea Co. v. Brasileiro (THE POCONE) [fire statute case; port engineer negligent in failing to discover danger of fire after ship entered New York harbor]; Williams S.S. Co. v. Wilbur (THE WILLSOLO) [fire statute case; owner's general agent had notice of improper stowage and ventilation].

**24.** *Cf.* Capitol Transp. Co. v. Cambria Steel Co. (THE BENJAMIN NOBLE), 1919, 249 U.S. 334, 336, 39 S.Ct. 292, 63 L.Ed. 631: "We very much appreciate the danger that the [Limitation] act should be cut down from its intended effect by too easy a finding of privity or knowledge on the part of owners * * *. We are not disposed to press the law in those directions further than the cases go."

**25.** *Cf.* Gilmore & Black, Admiralty 708 (2d ed. 1957).

only come from Congress.[26] We are unwilling to impose on all shipowners the burden of maintaining at every port of call an agent with authority over maintenance and repair. We are equally unwilling to transmute the master into such an agent whenever the ship calls at a foreign port in which the owner does not have such an agent. The statute applies to both small and large carriers; many small ones may be unable to meet the burden of such requirements.

■ We conclude that Capt. Patronas' failure to have the fathometer checked at the next port after Jensen told him that it was inoperative does not support the denial of limitation of liability.

*4. Limitation of liability—defective equipment.*

■ Appellees contend that the denial of limitation of liability can be affirmed on other grounds. Although they filed no cross-appeals, they argue that certain of the District Court's findings of fact were clearly erroneous.[27] This they may do. A cross-appeal is needed only when a party seeks to change or add to the relief afforded below, but not when a party merely seeks to sustain a judgment for reasons presented at trial but not relied upon by the trial judge (or even determined by the judge adversely to the appellee). An appellee may urge

any matter appearing in the record to support a judgment. Drinan v. A. J. Lindemann & Hoverson Co., 7 Cir., 1956, 238 F.2d 72, 74; Kansas City Life Ins. Co. v. Wells, 8 Cir., 1943, 133 F.2d 224, 228.

■ The District Court found that:

"The S.S. CHICKASAW was equipped with a radio direction finder, which instruments often have deviational errors which vary depending upon the bearing of the stations and which may change from time to time. It is normal and good practice for a vessel to have available for use with a radio direction finder a card or chart so that its readings may be corrected and that such a card be checked for accuracy at least once a year. No such card had been prepared for the S.S. CHICKASAW in recent years, and while this stranding took place in 1962, the card posted dated back to 1957. * * *"

This finding is fully supported by the record.

Failure to have on board an up-to-date correction card or chart was not merely contrary to good practice; it was a violation of a statutory duty.

Under 47 U.S.C. § 351(a) (2), (1964), it was unlawful for the CHICKASAW

"to be navigated * * * in the open sea, or * * * to leave any harbor

**26.** See Petition of Kinsman Transit Co. (THE MacGILVRAY SHIRAS), 2 Cir., 1964, 338 F.2d 708, 715; Saskatchewan Gov. Ins. Office v. Spot Pack, Inc., 5 Cir., 1957, 242 F.2d 385, 390–391.

**27.** The Second Circuit has held that the finding of negligence or lack of negligence in an admiralty case is not subject to the "clearly erroneous" rule, because such a finding involves the setting of a standard, which is "the usual hallmark of a jural act." Great Atl. & Pac. Tea Co. v. Brasileiro (THE POCONE), 2 Cir., 1947, 159 F.2d 661, 665, cert. denied, Republic of the United States of Brazil v. Great Atlantic & Pacific Tea Co., 331 U.S. 836, 67 S.Ct. 1519, 91 L.Ed. 1849. See e. g., Skibs A/S Dalfonn v. S/T Alabama, 2 Cir., 1967, 373 F.2d 101, 106. The rule in this circuit, however, is to the contrary. Rederi A/B Soya v. S.S. Grand Grace,

9 Cir., 1966, 369 F.2d 159, 162–163; Walston v. Lambertsen (THE FRANK L. III), 9 Cir., 1965, 349 F.2d 660, 663; Molitor v. American President Lines, Ltd., 9 Cir., 1965, 343 F.2d 217, 219; Port of Pasco v. Pacific Inland Nav. Co., 9 Cir., 1963, 324 F.2d 593, 600; Ramos v. Matson Nav. Co., 9 Cir., 1963, 316 F.2d 128, 131; Admiral Towing Co. v. Woolen (THE COMPANION), 9 Cir., 1961, 290 F.2d 641, 646; Pacific Tow Boat Co. v. States Marine Corp., 9 Cir., 1960, 276 F.2d 745, 752; Albina Engine & Mach. Works, Inc. v. American Mail Line, Ltd., 9 Cir., 1959, 263 F.2d 311, 314; Amerocean S.S. Co. v. Copp, 9 Cir., 1957, 245 F.2d 291, 293; City of Long Beach v. American President Lines, Ltd., 9 Cir., 1955, 223 F.2d 853, 855. See McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20.

or port of the United States for a voyage in the open sea, unless * * * equipped with an efficient radio direction finding apparatus (radio compass) properly adjusted in operating condition as hereinafter provided, which apparatus is approved by the [Federal Communications] Commission * * *."

At the time of the stranding, 47 C.F.R. § 8.517(a) [now 47 C.F.R. § 83.459 (1968)] provided that,

"to be approved by the Commission," the Radio Direction Finder must:
"(4) be accurately calibrated for the purpose of taking bearings from which the true bearing and direction may be determined for actual use in radio location service and maritime radio navigation service."

The District Court found that the latest correction chart posted on the vessel dated back to 1957. This finding is not clearly erroneous. And even this chart was useless. Capt, Patronas testified that he did not know whether the errors listed on it had already been compensated for in the R.D.F.'s permanent calibration; he had never been told anything about the chart by anyone. In other words, he simply did not know whether the correction chart should be used or not. Filippone, the second mate, also testified that he had never been told anything about this chart. There is no contrary evidence. Expert witnesses for both appellant and appellees agreed that it would be impossible to navigate accurately with the R.D.F. without knowing what the errors are. Although one might get an accurate reading, he would have no way of knowing it was accurate.

■ We hold that a radio direction finder has not been "accurately calibrated for the purpose of taking bearings from which the true bearing and direction may be determined" when up-to-date correction charts are not on the vessel, and when the master and crew are not in-

formed how to interpret whatever correction charts are on board the vessel.

The District Court, however, found that the condition of the radio direction finder did not cause or contribute to the stranding.

The court did not specifically consider the burden of proof. But because there was a statutory violation, the Pennsylvania Rule (The Pennsylvania, 1873, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148) places a very heavy burden of proof on Waterman:

"But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute."

As this court said in States S.S. Co. v. Permanente S.S. Corp., 9 Cir., 1956, 231 F.2d 82, 87:

"Hence, we read the phrase 'could not have been' in The Pennsylvania to mean that where a ship at the time of a collision is in violation of a statutory rule intended to prevent collisions, the burden of proof rests upon her to establish that the violation could not reasonably be held to have been a proximate cause of the collision."

The Pennsylvania Rule has been applied very strictly in this circuit. *"This burden it is frequently extremely difficult, if not impossible, for the violator to discharge, in the nature of things; and therein lies the true penalty imposed upon him."* *The Denali,* 9 Cir., 1939, 105 F.2d 413, on rehearing, 1940, 112 F.2d 952, 957, cert. denied, Alaska S.S. Co. v. Pacific Coast Coal Co., 311 U.S. 687, 61 S.Ct. 65, 85 L.Ed. 444 quoting from The Princess

Sophia, 9 Cir., 1932, 61 F.2d 339, 347. (Emphasis in *The Denali.*)[28]

Although the Pennsylvania Rule has been applied mainly in "rules of the road" and "manning" cases, it is also applicable to failure to provide equipment required by statute.[29]

■ We hold that Waterman has not sustained this heavy burden of proof. The District Court found that the fixes which the crew obtained with the radio direction finder before the stranding were so "wildly divergent and inconsistent" that they must have been caused by the crew's negligence, and not by the failure to have an up-to-date deviation card for the finder. But the failure to have an "efficient" radio direction finder is sufficient to deny limitation of liability if it merely *combined* with the crew's negligence in using it to be one of the causes of the stranding. The crew might well have been fairly careless with it precisely *because* they thought its readings would be of little value without an up-to-date deviation card. Nevertheless, the crew did take several fixes. Why would they have done so if they had not thought, or at least hoped, that it would be useful? How can it be said, except

as a matter of pure speculation, that if the finder had worked properly the grounding would still have occurred?

"[T]he navigation of a ship defectively equipped by a crew aware of her condition does not relieve the owner of his responsibility or transfer unseaworthiness into bad seamanship." The Maria, 4 Cir., 1937, 91 F.2d 819, 824.

We hold that the court's finding that the stranding was not caused by the ship's failure to have an efficient radio direction finder, is, in the light of the Pennsylvania Rule, clearly erroneous.

■ Finally, it is urged that the court did not find that the defective condition of the R.D.F. that we have described was with the *privity and knowledge* of Waterman, and that, absent such privity and knowledge, limitation cannot be denied. It is true that the court made no such finding; it was unnecessary for it to do so, because as we have seen, it found lack of causation. Because we hold that that finding was clearly erroneous, we must consider the privity and knowledge of Waterman.

On this issue the burden of proof was on Waterman. But we do not think that

28. The Pennsylvania Rule appiles to violations of regulations promulgated pursuant to statutory authority. Belden v. Chase, 1893, 150 U.S. 674, 698–699, 14 S.Ct. 264, 37 L.Ed. 1218. Furthermore, limitation may be denied for failure properly to equip a vessel even though no statute or regulation requires such equipment, Coleman v. Jahncke Service, Inc. (THE CLARIBEL), *supra*, 341 F.2d at 959; The T. J. Hooper, *supra*, 60 F.2d 737, 740.

29. See The Martello, 1894, 153 U.S. 64, 74, 14 S.Ct. 723, 38 L.Ed. 637; Richelieu & Nav. Co. v. Boston Marine Ins. Co. (THE SPARTAN), 1890, 136 U.S. 408, 10 S.Ct. 934, 34 L.Ed. 398; Pacific Tow Boat Co. v. States Marine Corp. (THE COTTON STATE), 9 Cir., 1960, 276 F. 2d 745, 749; Van Camp Sea Food Co. v. Di Leva, 9 Cir., 1948, 171 F.2d 454, 456; The Niagara, 2 Cir., 1898, 84 F. 902, 904–905; Wood v. United States (THE WILSON VICTORY), S.D.N.Y., 1954, 125 F. Supp. 42, 52–53; The Iowa, D.Or., 1940, 34 F.Supp. 843, 848–849; The Trave,

S.D.N.Y., 1893, 55 F. 117, 119–120, rev'd on other grounds, 2 Cir., 1895, 68 F. 390, cert. denied, 163 U.S. 692, 16 S.Ct. 1203, 41 L.Ed. 309; The Bolivia, E.D.N.Y., 1890, 43 F. 173, modified on other grounds, 2 Cir., 1891, 49 F. 169. See, Coryell v. Phipps (THE SEMINOLE), *supra*, 317 U.S. at 409, 63 S.Ct. 291, 87 L.Ed. 363; China Union Lines, Ltd. v. A. O. Anderson & Co. (THE UNION RELIANCE), *supra*, 364 F.2d at 787; Coleman v. Jahncke Service Inc., (THE CLARIBEL), *supra*, 341 F.2d at 958; States S.S. Co. v. United States (THE PENNSYLVANIA), *supra*, 259 F.2d at 464; The Cleveco, *supra*, 154 F.2d at 614; The Severance, 4 Cir., 1945, 152 F.2d 916, 922; The E. Madison Hall, 4 Cir., 1944, 140 F.2d 589, 591; Petition of Long (THE SMITH VOYAGER), S.D.N.Y., 1968, 293 F.Supp. 172, 178; Navegacion Castro Riva, S. A. of Panama v. The M. S. Nordholm, E.D.La., 1959, 178 F. Supp. 736, 741; Kutger v. United States, N.D.Fla., 1958, 169 F.Supp. 104, 106; Kulack v. The Pearl Jack, W.D.Mich., 1948, 79 F.Supp. 802, 806.

it was the extreme burden of the Pennsylvania Rule; that rule deals with causation, not privity or knowledge. See Coleman v. Jahncke Service Co., (THE CLARIBEL), *supra*, 341 F.2d at 958, and cases cited. Many cases hold that as to privity and knowledge, the ordinary rule of burden of proof—preponderance of the evidence—applies.[30] Language in The Denali, *supra*, 105 F.2d 413, 419–420, on which appellants rely, seems to us to refer to causation.

The question then is, would the record support a finding that the defect was without the privity or knowledge of Waterman? If the evidence is such that a finding either way would be supported, we should remand for a finding on this question.[31] On the other hand, if the record requires a finding of privity and knowledge, so that a contrary finding would be clearly erroneous, such a remand would be futile, particularly in this case. This action was filed on July 30, 1962. The question was fully explored. If the action can be properly terminated now, that is what should be done. We think that it can properly be done.

Waterman's Port Captain, Frank Murdock, testified that Waterman had no program for insuring that a recent table of corrections is kept on board. It relied on the annual check by the FCC and on RCA, which it hired to check the R.D.F. According to Murdock, the last time a cam was cut to adjust the functioning of the R.D.F. was in 1952. He had no knowledge of the last time that the ship was swung to test the accuracy of the R.D.F. He knew of no entry in the CHICKASAW's log showing that this had been done, as company rules require, within 90 days before the annual FCC check. Waterman had no program for finding out whether the R.D.F. needed repairs; it relied solely on the Master,

the chief mate of the deck department or the FCC to recommend that repairs be made. He knew of no piece of paper handed to the FCC or RCA men showing that the R.D.F. had been checked. Waterman left it to the master to check and to furnish a certificate to the FCC; it considered that the FCC provided an automatic check. He knew that the FCC would accept up to 5° error in R.D.F. bearings, and that there should be a table that the crew could use to correct R.D.F. readings. He never had any check made on board ship to see that there was such a table on board. The company had no system or program for doing so. The second mate and the captain have the most to do with the navigational equipment. The chief mate may be bucking for master and therefore also be extremely interested in that equipment. He could recall no conversation with any of those officers about the R.D.F. before the ship was grounded. He was on board the CHICKASAW several times, but could not remember noting the tables of radio direction finder error that the captain had posted in the ship.

Captain Patronas was given no instruction to check the R.D.F. against visual bearings. The second mate, Filippone, knew of no time that this had been done since 1958. Jensen, the third mate gave similar testimony, as did English, the first mate. And neither Patronas nor Filippone knew whether the 1957 table, the only one on board, was accurate. As Waterman's expert, Capt. Slack said: "Q. * * * it really isn't possible, sir, to use this instrument for accurate navigation unless you know what this error is, is it? A. That is correct."

We do not think that an owner can so completely delegate its statutory duty, even to the FCC. The regulation

30. For other cases, see 45A Modern Fed. Prac. Digest, Shipping ☞209(3) (h).

31. "It is the procedural policy of the federal appellate courts, where disputed issues are involved, that findings of fact and conclusions of law be made in the District Courts." Eastside Church of

Christ v. National Plan, Inc., 5 Cir., 1968, 391 F.2d 357, 363. And see Smallfield v. Home Ins. Co., 9 Cir., 1957, 244 F.2d 337, 341; Yanish v. Barber, 9 Cir., 1956, 232 F.2d 939, 946–947; Deering-Milliken Co. v. Modernaire of Hollywood, Inc., 9 Cir., 1955, 231 F.2d 623, 627.

requires an FCC certificate, but that is stated as in addition to the duty imposed on the shipowner, not as a substitute for it. FCC certification would be some evidence of compliance with the statutes and regulations; but it is not conclusive. See States S.S. Co. v. United States (THE PENNSYLVANIA), *supra*, 259 F.2d at 470; Artemis Maritime Co., Inc. v. Southwestern Sugar & Molasses Co., Inc. (THE DEMOSTHENES), 4 Cir., 1951, 189 F.2d 488, 492; Sabine Towing Co. v. Brennan (THE EDGAR F. CONEY), 4 Cir., 1934, 72 F.2d 490, 494. And it does not excuse Waterman's failure to carry out its own duty to see that there was a current, accurate deviation chart on board, or its duty to see that its responsible personnel knew how to use it.

■ As we have previously pointed out, an owner cannot close its eyes to what prudent inspection would disclose. See also States Steamship Co. v. United States, (THE PENNSYLVANIA), *supra*, 259 F.2d at 466. That is just what Waterman did in this case. We conclude that a finding of lack of privity or knowledge on Waterman's part would be clearly erroneous.

Affirmed.